[Nos. B183426, B186025. Second Dist., Div. Three. Feb. 20, 2009.]

BILLY BLANKS et al., Plaintiffs and Respondents, v.
SEYFARTH SHAW LLP et al., Defendants and Appellants.

Counsel

Moscarino & Connolly, John M. Moscarino, Joseph Connolly, Paula C. Greenspan; Greines, Martin, Stein & Richland, Kent L. Richland, Barbara W. Ravitz, Peter O. Israel and Alana B. Hoffman for Defendant and Appellant Seyfarth Shaw LLP.

Gibson, Dunn & Crutcher, Daniel M. Kolkey, Kevin S. Rosen, William E. Thomson and Dominic Lanza for Defendant and Appellant William H. Lancaster.

Law Offices of James R. Rosen, James R. Rosen, Adela Carrasco; Esner, Chang & Ellis, Stuart B. Esner and Gregory R. Ellis for Plaintiffs and Respondents.

Opinion

**ALDRICH, J.—**

## I.

## INTRODUCTION

In this legal-malpractice-based lawsuit, plaintiff and respondent Billy Blanks (Blanks) won a multimillion-dollar judgment against his former attorneys, defendants and appellants William H. Lancaster (Lancaster) and Seyfarth Shaw LLP (Seyfarth Shaw), jointly Seyfarth.[1]

The issues raised require us to discuss the exclusive jurisdiction of the Labor Commissioner in cases involving the Talent Agencies Act (Lab. Code, § 1700 et seq.; the TAA or the Act) as most recently decided by the Supreme Court in *Styne v. Stevens* (2001) 26 Cal.4th 42 [109 Cal.Rptr.2d 14, 26 P.3d 343] (*Styne*). We are also called upon to discuss the effect of Seyfarth's failure to file a petition with the commissioner within the Act's one-year statute of limitations (Lab. Code, § 1700.44, subd. (c)), and the doctrine of severability of contracts applied to the TAA as addressed in *Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974 [70 Cal.Rptr.3d 727, 174 P.3d 741] (*Marathon*).

---

[1] Lancaster and Seyfarth Shaw have filed separate briefs in this matter raising separate issues. However, the only possible conflict of interest between them is with regard to whether Seyfarth Shaw can be held liable for punitive damages, an issue we do not address. Thus, for simplicity and unless otherwise noted, we refer to Lancaster and Seyfarth Shaw jointly as Seyfarth.

■ We hold that (1) plaintiffs seeking affirmative relief under the TAA must bring their cases to the Labor Commissioner within the Act's one-year statute of limitations and cannot rely on the longer statute of limitations contained in the unfair competition law; (2) the trial court prejudicially erred in failing to properly instruct on the doctrine of severability of contracts; (3) the discovery rule cannot extend the TAA statute of limitations in this case; (4) the trial court prejudicially erred by addressing a subject not presented in a motion in limine; and (5) the issue of "judgmental immunity" must be addressed on remand.

We reverse and remand to the trial court for further proceedings.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background of the underlying case.*[2]

1. *The initial facts.*

Blanks is a celebrity karate champion. He developed Tae Bo, a fitness routine combining calisthenics, karate, dance, and pushups. The routine was ideal for weight control, organized exercise classes, and training. Blanks developed an enthusiastic following and established the Billy Blanks World Karate Center where people lined up around the block to take classes. Radio and television programs spotlighted the Tae Bo craze. Blanks was in demand for film projects and public appearances. The first mass-marketed Tae Bo videotape was a huge success.

2. *Blanks hires Greenfield.*

In 1991 or 1992, certified public accountant Jeffrey Greenfield (Greenfield) came into Blanks's studio as a client. Soon thereafter, Greenfield became Blanks's accountant.

In December 1997, Blanks hired licensed talent agent Suzy Unger (Unger) at the William Morris Agency.

In 1998, Greenfield convinced Blanks to change their relationship and allow Greenfield to manage Blanks's business affairs, negotiate business

---

[2] Following the usual rules on appeal from a judgment rendered after a trial, we view the facts in the light most favorable to the judgment. (*Woodman Partners v. Sofa U Love* (2001) 94 Cal.App.4th 766, 771 [114 Cal.Rptr.2d 566].)

deals and media appearances, and schedule Blanks's appearances, in return for 10 percent of Blanks's revenues. Greenfield did not have a talent agency license. Greenfield began to manage and oversee many aspects of Blanks's business. His responsibilities ranged from doing the payroll to handling computer problems, hiring employees who addressed apparel design and product marketing, and negotiating with the parking valet.

Greenfield introduced Blanks to his lawyers, John Younesi and Jan Yoss. Blanks retained Younesi & Yoss LLP's services.

While Blanks was represented by the William Morris Agency, Greenfield arranged a number of movie and television appearances in 1998 and 1999. However, Greenfield's inept actions also harmed Blanks. For example, Greenfield's negotiations relating to a television action project called *Tae Bo Squad* did not result in an agreement. The project fizzled during the contract stage. In 1999, Greenfield's mishandling of the negotiations for a television series called *Battle Dome* resulted in Blanks being paid only as a consultant and at a sum far below Blanks's worth.[3] Greenfield did not return telephone messages from those seeking to hire Blanks, resulting in lost opportunities.

Greenfield said he wanted to be Blanks's agent. Greenfield convinced Blanks to fire the William Morris Agency. On February 19, 1999, Yoss wrote a letter to the agency terminating its services.

In 1999, Greenfield tried to license the Tae Bo trademark to NCP Marketing Group, Inc. (NCP), the company that produced Blanks's infomercials. However, the deal fell through because Greenfield could not work with NCP's principal. Eventually, Blanks and Younesi & Yoss negotiated the deal, securing for Blanks $20 million annually for 7 years. Blanks received $30 million upon signing the NCP deal, including a $20 million advance.

Greenfield was receiving a 10 percent fee on royalties, appearance fees, and other income generated by Blanks, including that from the NCP infomercials and product sales.

While the NCP deal was pending and Blanks still was represented by the William Morris Agency, Greenfield proposed to Blanks a partnership in which Greenfield would leave his accounting practice and oversee all of Blanks's current and future business interests, including all financial, management, operational, and marketing functions. Greenfield was also to help Blanks set up a charitable foundation and obtain movie, television, and

---

[3] The testimony as to the amount Blanks was paid for the *Battle Dome* project is conflicting. One witness guessed that Blanks was paid less than $10,000, but certainly less than $50,000. Another witness testified Blanks may have received $5,000.

clothing deals. In exchange, Greenfield would obtain a percentage of all of Blanks's business. The proposal called for Greenfield initially to receive one-third of all of Blanks's income, escalating to a 49 percent share in 5 years. Blanks resisted, but agreed to a trial period during which Greenfield was to be given an opportunity to prove if he could be an agent and run Blanks's business. The agreement was never reduced to a writing and Blanks never considered Greenfield to be his partner. Greenfield began receiving periodic checks.

Blanks's wife, Gayle Blanks, had always been involved in Blanks's business. Around August 2, 1999, Mrs. Blanks wrote a lengthy letter to Greenfield detailing numerous complaints about Greenfield's role in Blanks's affairs. The letter prompted a four-hour meeting in August 1999, between Mrs. Blanks and Greenfield. At its conclusion, Mrs. Blanks was pressured into signing two checks Greenfield previously had prepared that were made payable to him. Mrs. Blanks signed the two checks, which totaled more than $7.6 million, in order "[t]o get Jeffrey out of our life." After arriving back at her home, Mrs. Blanks collapsed and was taken to the emergency room.

Including the two August 1999 checks, Greenfield received 16 checks from December 29, 1998 through August 2, 1999, totaling approximately $10.6 million. The record does not reflect how the amount of each check was calculated.[4]

In August 1999, Greenfield's check writing authority on Blanks's accounts was eliminated.

### 3. *Blanks hires Seyfarth Shaw to pursue Greenfield.*

In September 1999, Blanks, Mrs. Blanks, Jan Yoss, and John Younesi met with Greenfield at the Blanks's home. The meeting was contentious. After this meeting, Blanks and his wife met privately with Yoss. Yoss informed Blanks that Greenfield did not have a talent agency license. This was the first time Blanks had heard that Greenfield was supposed to be licensed.[5] Yoss

---

[4] The dates and the amounts of the checks are: (1) December 29, 1998—$16,000; (2) January 26, 1999—$16,000; (3) February 2, 1999—$1,540.80; (4) February 25, 1999—$605.30; (5) March 3, 1999—$1,361,667; (6) April 15, 1999—$75,570.65; (7) May 10, 1999—$41,059.84; (8) May 10, 1999—$173,182.85; (9) May 17, 1999—$14,000; (10) June 2, 1999—$793,436.23; (11) June 24, 1999—$34,988.24; (12) July 7, 1999—$400,000; (13) July 16, 1999—$25,611.61; (14) July 21, 1999—$27,848.32; (15) August 2, 1999—$3,600,000; and (16) August 2, 1999—$4,053,031.64.

[5] Mrs. Blanks testified that her best recollection was that she learned in August or September 1999 that Greenfield was unlicensed. Mrs. Blanks stated in a written chronology of events prepared by her that the contentious meeting occurred in September 1999.

suggested Blanks bring a lawsuit against Greenfield to recover the money Greenfield had received. Yoss referred Blanks to Seyfarth Shaw, a prominent law firm.

In October 1999, Blanks met with Seyfarth Shaw lawyers, Barbara A. Fitzgerald and Lancaster. During this first meeting, there was a discussion of Greenfield's unlicensed status under the TAA. Seyfarth began preparing a civil complaint no later than October 22, 1999. On October 27, 1999, Blanks formally retained the law firm to represent him. Lancaster had primary responsibility for the case.

The TAA requires all agents to be licensed. If an agent procures work for an artist and is unlicensed, the Act permits the Labor Commissioner to void *ab initio* all contracts between the parties and order the unlicensed agent to disgorge funds earned for those services. Such requests for affirmative relief first must be made by filing a claim with the Labor Commissioner, who has original jurisdiction over TAA claims. The TAA has a one-year statute of limitations, which the parties agree begins to run from the date the payment is made to the unlicensed agent. (Lab. Code, § 1700.44.) Generally, there is no right to conduct discovery in TAA matters before the commissioner.[6]

Lancaster knew, within a week or so after his first meeting with Blanks, that the Labor Commissioner had original jurisdiction over Blanks's TAA claim.

On November 4, 1999, Lancaster filed a civil lawsuit in the superior court on behalf of Blanks. The first cause of action was for violation of the TAA. It was based upon the fact that Greenfield was unlicensed. Greenfield's lack of licensure was also a foundational fact in the complaint's 16 other causes of action. For example, Blanks alleged as to all causes of action that "Greenfield gradually began to perform career management tasks on Blanks's behalf, including, for example, the negotiation of personal appearances and Tae Bo training engagements. . . . [A]t no time did [Greenfield] obtain licensure as . . . a talent agent . . . as required for the legitimate performance of the roles Greenfield purported to assume for Blanks." The complaint alleged that Greenfield handled and mishandled negotiations and often referred to Greenfield as a "manager/agent." The complaint sought disgorgement of all funds that had been paid to Greenfield, and other relief.

On December 6, 1999, Greenfield cross-complained for breach of contract. The cross-complaint alleged that Greenfield was owed at least $49 million based on a partnership agreement. That same week, Greenfield served his first round of discovery requests on Blanks.

---

[6] We discuss the TAA more fully *post*.

On December 29, 1999, the one-year TAA statute of limitations lapsed on the first check. The TAA statute of limitations lapsed on the 16th check on August 2, 2000.

From November 4, 1999, when Lancaster filed the civil lawsuit, until August 2, 2000, when the one-year TAA statute of limitations lapsed on the last of the 16 checks, the following occurred:

On February 8, 2000, Division Two of the Second District Court of Appeal filed and certified for publication *Styne v. Stevens* (B121208) in which the Court of Appeal prominently discussed the Labor Commissioner's exclusive original jurisdiction in TAA matters and the TAA's one-year statute of limitations. This decision involved a case in which an entertainer defended a lawsuit filed by her longtime personal manager. She argued that any contract with her manager was unenforceable because he was not a licensed talent agent. About a week after the Court of Appeal rendered its decision, another lawyer with whom Blanks had consulted wrote Blanks a letter alerting him to the opinion and the lawyer's concern that Seyfarth had not filed a petition with the Labor Commissioner within the one-year statute of limitations. Blanks forwarded the letter to those at Seyfarth involved in Blanks's case. A Seyfarth attorney researched the Court of Appeal decision and Seyfarth held conferences about the issues it raised. Lancaster knew that an older case, *Buchwald v. Superior Court* (1967) 254 Cal.App.2d 347 [62 Cal.Rptr. 364], held that the Labor Commissioner had original jurisdiction over TAA issues. Seyfarth researched and prepared a petition to be filed with the commissioner.

On March 16, 2000, a status conference was held in the superior court during which Lancaster admitted he might have to file a petition with the Labor Commissioner in order to preserve Blanks's TAA claims and file a motion to stay the civil lawsuit. In response, the court invited Blanks to bring a stay motion. The court set trial and final status conference dates for February 2001.

On March 23, 2000, Lancaster sent Blanks a letter advising him of the status of the case, including an update as to ongoing discovery disputes. Lancaster stated in the letter that a motion to stay the TAA claim and the TAA petition were "being prepared and will be filed next week."

On June 2, 2000, the California Supreme Court granted review of the February 8, 2000, Court of Appeal opinion, *Styne v. Stevens* (June 2, 2000, S086787).[7]

---

[7] On July 12, 2001, the Supreme Court filed *Styne, supra,* 26 Cal.4th 42 extensively addressing the one-year statute of limitations under the Act. We discuss the Supreme Court

During the spring of 2000, Blanks's new business advisor, Michael Crum, became concerned that Blanks already had spent $300,000 on the case against Greenfield. Crum requested Lancaster to prepare a projected budget for the Greenfield litigation for the next six months. In response, Lancaster informed Crum that the estimated budget to pursue the case was in excess of $200,000. This included the cost of taking 10 to 15 depositions.

By the summer of 2000, Seyfarth had not requested a stay of the civil action against Greenfield. In July 2000, Seyfarth served its first notice of Greenfield's deposition. Blanks's deposition commenced on July 12, 2000.

In late August 2000, Lancaster made a frantic telephone call to Blanks's home. Lancaster asked Mrs. Blanks when Blanks first had learned that Greenfield was not a licensed talent agent. Mrs. Blanks told Lancaster that Yoss had told Blanks about Greenfield's lack of licensure in August or September 1999. (See fn. 5, *ante.*) Blanks's recollection was that the purpose of the telephone call was that Lancaster had inquired about when Blanks had last paid Greenfield. Lancaster abruptly ended the call after stating he had to get something filed. Less than 24 hours later, Seyfarth sent Blanks's petition to determine controversy to the Labor Commissioner by Federal Express. The petition was received by the commissioner the next business day, Monday, August 28, 2000.

On September 6, 2000, Greenfield refused to appear for his deposition scheduled for the next day because Seyfarth had filed a petition with the Labor Commissioner. In October 2000, Seyfarth filed a motion to stay the *Blanks v. Greenfield* civil lawsuit.

### 4. *Blanks fires Seyfarth.*

Blanks hired the law firm of Allen Matkins Leck Gamble & Mallory, LLP, which substituted into the case against Greenfield on October 20, 2000. On November 2, 2000, the superior court heard and granted the motion to stay that had been filed by Seyfarth, pending the TAA hearing before the Labor Commissioner.

While Seyfarth was handling Blanks's case against Greenfield, Blanks paid Seyfarth approximately $400,000. According to Seyfarth, Blanks still owed approximately $46,000.

Attorney Martin Singer of Lavely & Singer was experienced in handling TAA claims. He associated into the case against Greenfield and presented

---

opinion more fully *post.* It focused on whether the one-year TAA statute of limitations precluded an artist from using the TAA as a defense.

Blanks's claims to the Labor Commissioner. The hearing before the Labor Commissioner began on September 10, 2001, and was continued to November 5, 2001. At the hearing, Attorney Singer explained how Greenfield had violated the TAA.

### 5. *The Labor Commissioner's ruling.*

On March 11, 2002, the Labor Commissioner issued a formal determination of controversy finding that Greenfield was operating as an unlicensed talent agent and had violated the TAA at least twice (once for *Tae Bo Squad* and once for *Battle Dome*). The commissioner further ruled that Blanks's petition was untimely because Blanks had not satisfied the one-year TAA statute of limitations and thus, the commissioner could not order Greenfield to disgorge monies he had received from Blanks. Finally, the commissioner ruled that Greenfield's "partnership" agreement was void *ab initio* and unenforceable.

Blanks and Greenfield both requested a trial de novo in the superior court.

### 6. *In writ proceedings we have concluded that Blanks's TAA disgorgement request is time-barred.*

The superior court lifted the stay of the *Blanks v. Greenfield* civil proceedings. Greenfield moved for summary adjudication, arguing the TAA statute of limitations barred all recovery by Blanks on the first cause of action for violating the TAA. Greenfield noted that the last payment to him had been made on August 2, 1999, yet Blanks had not filed his petition with the commissioner until August 28, 2000. On May 17, 2002, the trial court denied the motion. Greenfield filed a petition for writ of mandate in this court requesting that we direct the trial court to grant the motion and enter a judgment in his favor on the first cause of action. In opposing the petition, Blanks argued that he had complied with the time limitations contained in Labor Code section 1700.44 because he had timely filed an "action or proceeding."

On February 27, 2003, we filed *Greenfield v. Superior Court* (2003) 106 Cal.App.4th 743 [131 Cal.Rptr.2d 179]. We rejected Blanks's argument that filing a complaint in the superior court tolled the TAA one-year statute of limitations. In doing so, we rejected Blanks's position that by filing in the superior court he had complied with Labor Code section 1700.44's filing requirement as he had timely filed an "action or proceeding." (*Greenfield, supra,* at pp. 747–751.) We also rejected Blanks's argument that there was no time limit on filing his TAA petition based upon the assertion that his complaint was a defensive pleading. (*Greenfield,* at pp. 751–753; see fn. 7,

*ante*; *Styne, supra*, 26 Cal.4th 42, discussed *post.*) We directed the superior court to grant Greenfield's motion for summary adjudication because Blanks had failed to timely bring his TAA cause of action before the commissioner. (*Greenfield v. Superior Court, supra*, at p. 753.) Blanks then filed a petition for review with the Supreme Court.

### 7. Blanks settles with Greenfield.

On April 9, 2003, Blanks and Greenfield entered into a settlement agreement conditioned upon the Supreme Court's denial of Blanks's petition for review. Pursuant to the conditional settlement, the TAA petition and all disputes between Blanks and Greenfield contained in Blanks's civil complaint and Greenfield's cross-complaint were resolved by Greenfield's payment to Blanks of $225,000, and a $25,000 charitable contribution. On June 11, 2003, the Supreme Court denied the petition for review and the conditional settlement was implemented.

### B. The present action against Seyfarth Shaw and Lancaster.

Blanks filed this lawsuit against Seyfarth Shaw and Lancaster alleging causes of action for legal malpractice, breach of fiduciary duty, and fraudulent concealment. The essence of the complaint was that Seyfarth Shaw and Lancaster failed to timely file a petition before the Labor Commissioner, which resulted in Blanks's inability to recover all of the approximate $10.6 million Blanks had paid to Greenfield. Blanks alleged the loss of his case against Greenfield was a direct result of Seyfarth's conscious decision to defer filing the petition with the Labor Commissioner in order to generate legal fees. Blanks also alleged that Seyfarth misled him into believing that the petition would be, or was, timely filed, and concealed the running of the TAA statute of limitations.

Seyfarth answered the complaint. Seyfarth Shaw cross-complained for breach of contract alleging Blanks owed $46,365.97 in attorney's fees. After a critical pretrial ruling by the trial court, Seyfarth Shaw dismissed the cross-complaint without prejudice.

### 1. The trial in this legal-malpractice-based case.

The jury trial lasted six weeks. Because the trial involved accusations of legal malpractice, there was a trial within a trial, i.e., Blanks had to prove that Seyfarth was negligent and that had Seyfarth not been negligent, Blanks would have been successful in pursuing the underlying case against Greenfield and would have recovered more than the settlement amount.

Blanks argued that had Seyfarth timely filed a petition with the commissioner, Blanks would have been able to obtain a disgorgement order from the Labor Commissioner requiring Greenfield to return the entire amount paid to him (approximately $10.6 million) because Greenfield did not have a talent agency license. Blanks claimed it was irrelevant whether Greenfield's unlicensed acts could be severed from the licensed ones. Blanks claimed that Seyfarth intentionally delayed filing the petition in order to inflate attorney's fees.

With regard to the breach of fiduciary duty and fraudulent concealment causes of action, Blanks asserted Seyfarth purposefully and knowingly put its financial interests above Blanks's and concealed the fact that the TAA petition had not been timely filed.

### 2. Seyfarth's defense.

Lancaster's stated reason for filing the civil complaint, rather than filing a claim with the Labor Commissioner, was that he wished to conduct civil discovery and take Greenfield's deposition. He testified he knew that as soon as the TAA petition was filed, the civil action would be stayed, precluding discovery. Without corroboration, Lancaster testified that on May 10 or 11, 2000, Blanks agreed to the strategy of deferring the filing of the TAA petition with the Labor Commissioner in favor of conducting discovery in the civil lawsuit. Lancaster admitted he knew that the crucial date was the date each payment was made to Greenfield and that he knew the commissioner had original jurisdiction over Blanks's TAA claim.

On a motion in limine, the trial court held that Seyfarth Shaw and Lancaster were negligent as a matter of law and precluded most of Lancaster's testimony with regard to his trial strategy rationale. The trial court's ruling precluded Seyfarth from arguing that the "judgmental immunity doctrine" precluded a finding that it had been negligent. However, Lancaster was permitted to testify that he was confident that the TAA statute of limitations would be tolled based upon the delayed discovery doctrine. Alternatively, Lancaster testified he believed that bringing suit in the superior court might satisfy the TAA's filing requirements because it was the filing of an "action or proceeding."[8] Lancaster also testified he believed there was an open question as to whether the TAA applied if the arrangement between Blanks and Greenfield was a partnership, as claimed by Greenfield.[9] Lancaster further testified he had concluded that the non-TAA causes of action had

---

[8] As discussed above, we rejected this argument in *Greenfield v. Superior Court, supra,* 106 Cal.App.4th at pages 747 to 751.

[9] Lancaster noted that *Waisbren v. Peppercorn Productions, Inc.* (1995) 41 Cal.App.4th 246 [48 Cal.Rptr.2d 437] declined to address whether the Act applied when the nonlicensed agent

longer statutes of limitations and could yield equal or better remedies than those under the TAA.[10] He believed that Blanks's TAA claims were worth far less than $10.6 million because virtually all of the $10.6 million came from the NCP deal. Lancaster acknowledged that if the commissioner did not order disgorgement of all sums paid to Greenfield, the commissioner could order partial disgorgement, or exercise equitable powers to disallow all recovery.

### 3. *The verdict and judgment.*

The jury returned a series of special verdicts finding that Greenfield had acted as a talent agent and that had Seyfarth timely filed a TAA petition with the Labor Commissioner, Blanks would have been entitled to an award of $10,634,542.48.

The jury also found Seyfarth liable on all causes of action. On the legal malpractice claim, the jury found Seyfarth had been negligent in allowing Blanks's TAA claim to lapse, and awarded Blanks $9,310,972.[11] The jury further found that Seyfarth breached fiduciary duties to Blanks and awarded Blanks $500,000 in damages.[12]

The jury found, by clear and convincing evidence, that Seyfarth Shaw had ratified Lancaster's conduct, which was committed with malice, fraud or oppression. The jury awarded Blanks $10 million on the fraudulent concealment cause of action, finding that Seyfarth had concealed or suppressed a material fact. In the second phase of trial, the jury imposed $15 million in punitive damages against Seyfarth Shaw only.

The superior court deemed the $10 million fraud jury award to be duplicative of the damages awarded by the jury for legal malpractice. Judgment was entered in favor of Blanks against Seyfarth for $10.5 million in compensatory damages and $15 million in punitive damages against Seyfarth

---

was an artist's partner or coproducer. (*Waisbren*, at p. 263.) (*Styne, supra,* 26 Cal.4th at pp. 57–58 distinguishes *Waisbren* on other grounds.)

[10] To support this theory, Lancaster mentioned in the trial a number of causes of action, including those brought under the Miller-Ayala Athlete Agents Act (relating to professional athlete representation, Bus. & Prof. Code, § 18895 et seq.) and the unfair competition law (Bus. & Prof. Code, § 17200 et seq.). On appeal, Seyfarth focuses on the unfair competition law and merely alludes to the Miller-Ayala Athlete Agents Act.

[11] This damage award is precisely Greenfield's net worth at the time Blanks's TAA claim lapsed, signifying that the jury believed this was the amount that was collectable.

[12] This damage award may have been based on the amount of attorney's fees Blanks had paid to Seyfarth Shaw. Blanks paid a total of $400,240.59 in attorney's fees to Seyfarth Shaw and $198,331.95 to successor counsel.

Shaw only. The court also awarded Blanks more than $5.6 million in interest, attorney's fees, and costs.[13]

Seyfarth appeals from the judgment.

## III.

## CONTENTIONS

Seyfarth Shaw and Lancaster contend they are entitled to judgment as a matter of law because Blanks cannot prove causation and damages in this legal-malpractice-based lawsuit. This argument is premised upon these two theories: (1) in the underlying lawsuit the unfair competition law cause of action would have yielded the same result as the TAA cause of action and so it does not matter that Seyfarth failed to timely file a petition with the Labor Commissioner; and (2) when the doctrine of severability is applied to his case, Blanks did not show he was entitled to more than that recovered in his settlement with Greenfield. We first address these two contentions because they could have been dispositive. In doing so, we must discuss the burden of proof required in legal malpractice cases and the parameters of the TAA (Lab. Code, § 1700 et seq.). Thereafter, we address a number of other arguments raised by the parties, including those relating to the doctrines of delayed discovery and "judgmental immunity." Because there were two prejudicial instructional errors, we reverse the judgment and remand to the trial court for further proceedings.

## IV.

## DISCUSSION

A. *Trial within a trial.*

In this case premised upon a claim of legal malpractice, Blanks accuses Seyfarth of losing his right to seek redress from Greenfield because Seyfarth failed to timely file a petition with the Labor Commissioner.

■ "In civil malpractice cases, the elements of a cause of action for professional negligence are: '(1) the duty of the attorney to use such skill, prudence and diligence as members of the profession commonly possess;

---

[13] Mrs. Blanks and Blanks had a wholly owned production company, BG Star Productions, Inc. Mrs. Blanks and the production company were also plaintiffs and judgment was also rendered in their favor. They also appear on appeal as respondents. For simplicity and unless otherwise necessary, we have referred only to Blanks.

(2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage. [Citations.]' [Citation.]" (*Wiley v. County of San Diego* (1998) 19 Cal.4th 532, 536 [79 Cal.Rptr.2d 672, 966 P.2d 983]; see also *Lazy Acres Market, Inc. v. Tseng* (2007) 152 Cal.App.4th 1431, 1435 [62 Cal.Rptr.3d 378].)

■ "In addressing breach of duty, 'the crucial inquiry is whether [the attorney's] advice was so legally deficient when it was given that he [or she] may be found to have failed to use "such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." [Citation.]' [Citations.]" (*Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 397 [134 Cal.Rptr.2d 689], citing, among others, *Smith v. Lewis* (1975) 13 Cal.3d 349, 356 [118 Cal.Rptr. 621, 530 P.2d 589], disapproved on another ground in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851, fn. 14 [126 Cal.Rptr. 633, 544 P.2d 561]; accord, *Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229, 1237 [45 Cal.Rptr.2d 565].)

■ With regard to causation and damages, the plaintiff is required to prove that but for the defendant's negligent acts or omissions, "the plaintiff would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241 [135 Cal.Rptr.2d 629, 70 P.3d 1046]; accord, *DiPalma v. Seldman* (1994) 27 Cal.App.4th 1499, 1506–1507 [33 Cal.Rptr.2d 219].) As such, a determination of the underlying case is required. This method of presenting a legal malpractice lawsuit is commonly called a trial within a trial. It may be complicated, but it avoids speculative and conjectural claims. (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 834 [60 Cal.Rptr.2d 780]; accord, *Viner v. Sweet, supra,* at p. 1241.)[14]

"The trial-within-a-trial method does not 'recreate what a particular judge or fact finder would have done. Rather, the jury's task is to determine what a reasonable judge or fact finder would have done . . . .' [Citation.] Even though 'should' and 'would' are used interchangeably by the courts, the standard remains an *objective* one. The trier of fact determines what *should* have been, not what the result *would* have been, or could have been, or might have been, had the matter been before a *particular judge* or jury. [Citations.]" (*Mattco Forge, Inc. v. Arthur Young & Co., supra,* 52 Cal.App.4th at p. 840; see also *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 973 [105 Cal.Rptr.2d 88].)

■ If the underlying issue originally was a factual question that would have gone to a tribunal rather than a judge, it is the jury who must decide

---

[14] Other courts have used the phrases "suit-within-a-suit" or "case-within-a-case." (*Mattco Forge, Inc. v. Arthur Young & Co., supra,* 52 Cal.App.4th at pp. 832–833.)

what a reasonable tribunal would have done. The identity or expertise of the original trier of fact (i.e., a judge or an arbitrator or another type of adjudicator) does not alter the jury's responsibility in the legal malpractice trial within a trial. (*Piscitelli v. Friedenberg, supra*, 87 Cal.App.4th at pp. 969–971.) However, if reasonable minds cannot differ as to what would have happened had the attorney acted otherwise, this issue can become a legal issue for the court. (*Id.* at pp. 970–971, citing *Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 864 [64 Cal.Rptr.2d 324] [" 'The question about what would have happened had [the lawyer] acted otherwise is one of fact unless reasonable minds could not differ as to the legal effect of the evidence presented.' "].)[15]

### B. *The TAA.*

#### 1. *The general parameters of the TAA.*

In the recent case of *Marathon, supra*, 42 Cal.4th 974, the Supreme Court examined the TAA. (Lab. Code, § 1700 et seq.) *Marathon* explained: "In Hollywood, talent—the actors, directors, and writers, the Jimmy Stewarts, Frank Capras, and Billy Wilders who enrich our daily cultural lives—is represented by two groups of people: agents and managers. Agents procure roles; they put artists on the screen, on the stage, behind the camera; indeed, by law, only they may do so. Managers coordinate everything else; they counsel and advise, take care of business arrangements, and chart the course of an artist's career. [¶] This division largely exists only in theory. The reality is not nearly so neat. The line dividing the functions of agents, who must be licensed, and of managers, who need not be, is often blurred and sometimes crossed." (*Marathon, supra*, at p. 980.) "In Hollywood, talent agents act as intermediaries between the buyers and sellers of talent. [Citation.] . . . Generally speaking, an agent's focus is on the deal: on negotiating numerous short-term, project-specific engagements between buyers and sellers. [Citation.]" (*Id.* at p. 983.) " 'Personal managers primarily advise, counsel, direct, and coordinate the development of the artist's career. They advise in both business and personal matters, frequently lend money to young artists, and serve as spokespersons for the artists.' [Citation.]" (*Id.* at p. 984.)

---

[15] *Piscitelli v. Friedenberg, supra*, 87 Cal.App.4th 953 provides an example. In *Piscitelli*, the plaintiff hired an attorney to bring claims against his ex-employer, an investment firm. The proceedings would have involved an arbitration proceeding before the New York Stock Exchange (NYSE). The attorney appealed from a verdict against him in the plaintiff's legal malpractice case. As part of its discussion, the *Piscitelli* court stated that a determination of the underlying case in a legal malpractice action required a determination as to whether the plaintiff, Piscitelli, "would have prevailed in an arbitration proceeding before the NYSE and obtained an award against [Piscettelli's ex-employer] absent [his attorney's] negligence. [Citations.]" (*Id.* at p. 970.) "Under this format, it was precisely the jury's role to step into the shoes of the arbitrators, consider the facts of Piscitelli's underlying claims and ultimately determine their merits." (*Id.* at p. 974.)

The TAA regulates talent agencies. Its "roots extend back to 1913, when the Legislature . . . imposed the first licensing requirements for employment agents. [Citations.] From an early time, the Legislature was concerned that those representing aspiring artists might take advantage of them, whether by concealing conflicts of interest when agents split fees with the venues where they booked their clients, or by sending clients to houses of ill repute under the guise of providing 'employment opportunities.' [Citations.] Exploitation of artists by representatives has remained the Act's central concern through subsequent incarnations to the present day. [Citation.]" (*Marathon, supra*, 42 Cal.4th at p. 984, citing, among others, *Buchwald v. Superior Court, supra*, 254 Cal.App.2d at p. 357.)

■ The TAA defines talent agencies as "persons or corporations that procure professional 'employment or engagements' [citation] for creative or performing 'artists' [citation] in the entertainment media, including theater, movies, radio, and television [citation]." (*Styne, supra*, 26 Cal.4th at p. 46, citing Lab. Code, § 1700.4, subds. (a), (b).) The TAA "requires anyone who solicits or procures artistic employment or engagements for artists to obtain a talent agency license. ([Lab. Code,] §§ 1700.4, 1700.5.)" (*Marathon, supra*, 42 Cal.4th at p. 985, fn. omitted.)[16] "No separate analogous licensing or regulatory scheme extends to personal managers. (*Waisbren v. Peppercorn Productions, Inc., supra*, 41 Cal.App.4th at p. 252.)" (*Marathon, supra*, at p. 985.) Also, the TAA does not "govern assistance in an artist's business transactions other than professional employment." (*Styne, supra*, at p. 51; accord, *Marathon, supra*, at pp. 983–985.)

■ The Act "regulates *conduct*, not labels; it is the act of procuring (or soliciting), not the title of one's business, that qualifies one as a talent agency and subjects one to the Act's licensure and related requirements. ([Lab. Code,] § 1700.4, subd. (a).) Any person who procures employment—any individual, any corporation, any manager—is a talent agency subject to regulation. ([Lab. Code,] §§ 1700, 1700.4, subd. (a).)" (*Marathon, supra*, 42 Cal.4th at p. 986.) Thus, "a personal manager who solicits or procures employment for his [or her] artist-client is subject to and must abide by the Act. [Citations.]" (*Ibid.*)

A single or incidental act of procurement brings one under the TAA. (*Marathon, supra*, 42 Cal.4th at pp. 987–988.) "[A]ny contract of an unlicensed person for talent agency services is illegal and void *ab initio*." (*Styne, supra*, 26 Cal.4th at p. 46.) When a person has engaged in unlawful procurement because that person is not licensed, the Labor Commissioner has the power to void the contract and is empowered "to deny all recovery for

---

[16] Labor Code section 1700.5 reads in part: "No person shall engage in or carry on the occupation of a talent agency without first procuring a license therefor from the Labor Commissioner."

services where the Act has been violated" and order restitution to the artist. (*Marathon, supra,* at p. 995.)

### 2. *Commissioner's exclusive original jurisdiction.*

■ The Labor Commissioner is given exclusive original jurisdiction over controversies colorably arising under the TAA, which must be brought within one year.

■ Labor Code section 1700.44, subdivision (c) details the TAA limitation period. It provides that "[n]o action or proceeding shall be brought pursuant to [the Act] with respect to any violation which is alleged to have occurred more than one year prior to commencement of the action or proceeding." As we held in *Greenfield v. Superior Court, supra,* 106 Cal.App.4th 743, filing a complaint in the superior court does not satisfy Labor Code section 1700.44's filing requirement as it is not an "action or proceeding" (*Greenfield, supra,* at p. 748) as envisioned in the Act. Rather, a petition must be filed with the commissioner. (106 Cal.App.4th at pp. 747–751.)

The jurisdiction of the commissioner is specified in Labor Code section 1700.44, subdivision (a), which reads in part: "In cases of controversy arising under this chapter, the parties involved shall refer the matters in dispute to the Labor Commissioner, who shall hear and determine the same, subject to an appeal within 10 days after determination, to the superior court where the same shall be heard de novo."

■ Generally, there is no due process right to discovery in TAA hearings before the commissioner. Rather, the scope of discovery is governed by statute and the commissioner's discretion. (See generally Gov. Code, §§ 11500 et seq., 11507.5–11507.7, 11513; cf. *California Teachers Assn. v. California Com. on Teacher Credentialing* (2003) 111 Cal.App.4th 1001, 1012 [4 Cal.Rptr.3d 369]; *Cimarusti v. Superior Court* (2000) 79 Cal.App.4th 799, 808–809 [94 Cal.Rptr.2d 336].)

■ After the issues are first addressed by the commissioner, both parties have the right to a trial de novo. "De novo" review "means that the appealing party is entitled to a complete new hearing—a complete new trial—in the superior court that is in no way a review of the prior proceeding." (*Buchwald v. Katz* (1972) 8 Cal.3d 493, 502 [105 Cal.Rptr. 368, 503 P.2d 1376].) If an artist seeking to recover funds paid to an unlicensed agent prematurely files a civil lawsuit prior to filing with the commissioner, the superior court proceedings are stayed until the remedies before the commissioner are exhausted. (*Styne, supra,* 26 Cal.4th at p. 58; cf. *Pacific Bell v. Superior Court* (1986) 187 Cal.App.3d 137, 140–141 [231 Cal.Rptr. 574].)

*Styne, supra,* 26 Cal.4th 42, provides the Supreme Court's most recent discussion about the commissioner's jurisdiction in TAA matters. In *Styne,* plaintiff Styne sued "Connie Stevens, a prominent entertainer, for sums allegedly due under an oral contract. Before trial, Stevens sought summary judgment on grounds that the alleged contract involved Styne's procurement of professional employment for Stevens, that Styne thus acted as a talent agency but lacked the necessary license, and that the contract was therefore illegal and void under the Talent Agencies Act." (26 Cal.4th at pp. 46–47.) The Supreme Court first held that the TAA one-year statute of limitations did not prevent Stevens from relying upon the TAA *as a defense.* (26 Cal.4th at pp. 51–54.)

*Styne* then rejected Stevens's argument that referral to the commissioner was "not necessary when the artist alleges a violation of the Talent Agencies Act solely as a *defense* in a garden-variety court action for breach of contract." (*Styne, supra,* 26 Cal.4th at p. 56.) The Supreme Court concluded that the proper procedure "is simply to stay the superior court proceedings and file a 'petition to determine controversy' before the Commissioner. [Citations.]" (*Id.* at p. 58.) In reaching this conclusion, the court relied upon the statutory language and also upon a number of earlier cases, dating back to 1949, discussing the commissioner's broad jurisdiction. (*Id.* at pp. 54–59, citing, among others, *Buchwald v. Katz, supra,* 8 Cal.3d 493; *Garson v. Div. of Labor Law Enforcement* (1949) 33 Cal.2d 861 [206 P.2d 368]; *REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489 [81 Cal.Rptr.2d 639]; and *Buchwald v. Superior Court, supra,* 254 Cal.App.2d 347.)

*Styne* noted that Labor Code "[s]ection 1700.4, subdivision (a) specifies that in all 'cases *of controversy*' arising under the Talent Agencies Act, 'the *parties involved* shall refer the *matters in dispute*' to the Commissioner. . . . This broad language plainly requires all such 'controvers[ies]' and 'dispute[s]' between 'parties' to be examined in the first instance by the Commissioner, not merely those 'controvers[ies]' and 'dispute[s]' where the 'part[y]' invoking the Act seeks affirmative relief." (*Styne, supra,* 26 Cal.4th at p. 56, fn. omitted.)

The Supreme Court also referred to predecessor case law when it stated, " '[t]he Commissioner has the authority to hear and determine various disputes, *including the validity of artists' manager-artist contracts and the liability of the parties thereunder.* ([*Buchwald v. Superior Court, supra,* 254 Cal.App.2d 347,] 357.) The reference of disputes involving the [A]ct to the Commissioner is *mandatory.* [Citation.] Disputes *must* be heard by the Commissioner, and all remedies before the Commissioner *must* be exhausted before the parties can proceed to the superior court. [Citation.]' [Citations.]

[¶] When the Talent Agencies Act is invoked in the course of a contract dispute, the Commissioner has exclusive jurisdiction to determine his jurisdiction over the matter, including whether the contract involved the services of a talent agency. (*Buchwald v. Katz*[, *supra*,] 8 Cal.3d 493, 496 . . . ; see *Buchwald v. Superior Court, supra*, 254 Cal.App.2d 347, 360–361.) Having so determined, the Commissioner may declare the contract void and unenforceable as involving the services of an unlicensed person in violation of the Act. [Citations.] It follows that a claim to this effect must first be submitted to the Commissioner, and that forum must be exhausted, before the matter can be determined by the superior court." (*Styne, supra*, 26 Cal.4th at pp. 54–56, fn. omitted.)

■ *Styne* continued, "Our conclusion that [Labor Code] section 1700.44, by its terms, gives the Commissioner exclusive original jurisdiction over controversies arising under the Talent Agencies Act comports with, and applies, the general doctrine of exhaustion of administrative remedies. With limited exceptions, the cases state that where an adequate administrative remedy is provided by statute, resort to that forum is a 'jurisdictional' prerequisite to judicial consideration of the claim. [Citations.]" (*Styne, supra*, 26 Cal.4th at p. 56.) "[R]eferral to the Commissioner serves the intended purpose of the doctrine of exhaustion of administrative remedies—to reduce the burden on courts while benefiting from the expertise of an agency particularly familiar and experienced in the area. [Citations.]" (*Id.* at p. 58.)

■ *Styne* explained the broad and comprehensive reach of the commissioner's jurisdiction: "The Commissioner's exclusive jurisdiction to determine his jurisdiction over issues colorably arising under the Talent Agencies Act thus empowers him alone to decide, in the first instance, whether the facts do bring the case within the Act. When statutes require a particular class of controversies to be submitted *first* to an administrative agency as a *prerequisite* to judicial consideration, and the parties reasonably dispute whether their case falls into that category, it lies within the *agency's* power 'to determine *in the first instance*, and *before judicial relief may be obtained*, whether [the] controversy falls within the [agency's] statutory grant of jurisdiction [citations].' [Citations.] . . . [C]ases involving the Talent Agencies Act are in accord. (*Buchwald v. Katz, supra*, 8 Cal.3d 493, 496 [where facts alleged in court permitted inference that parties' relationship involved unlicensed talent agency services, Commissioner had exclusive jurisdiction to determine his jurisdiction over the dispute, first ascertaining whether plaintiff had in fact acted as talent agency by securing employment and bookings pursuant to contract]; see *Buchwald v. Superior Court, supra*, 254 Cal.App.2d 347, 360 [citation].) [¶] . . . [¶] Here, and in many similar cases under the Talent Agencies Act, a conclusion that the superior court has the prior exclusive right to determine the issue of jurisdiction would undermine the clear purpose of [Labor Code] section 1700.44, subdivision (a), and the

principle of exhaustion of administrative remedies generally, by giving the court, not the Commissioner, the exclusive right to decide in the first instance *all the legal and factual issues on which an Act-based defense depends.* Once the court resolved whether Styne had acted as a talent agency under the contract, and even if the court concluded he *had done so*, there would be little or nothing left for the Commissioner to resolve." (*Styne, supra,* 26 Cal.4th at p. 55, fn. 6.)

■ *Styne* used the term "colorable" in its broadest sense: "Certainly the superior court need not refer to the Commissioner a case which, despite a party's contrary claim, clearly has *nothing to do* with the Act. For example, an automobile collision suit between persons unconnected to the entertainment industry is manifestly not a controversy arising under the Act, and it cannot be made one by mere utterance of words. On the other hand, if a dispute in which the Act is invoked plausibly pertains to the subject matter of the Act, the dispute should be submitted to the Commissioner for first resolution of both jurisdictional and merits issues, as appropriate." (*Styne, supra,* 26 Cal.4th at p. 59, fn. 10.)[17]

C. *Seyfarth may not circumvent the mandatory TAA procedural requirements by asserting that Blanks would have been fully compensated under the unfair competition law.*

The civil lawsuit filed by Seyfarth on behalf of Blanks on November 4, 1999, identified 17 causes of action, *all* premised upon the allegation that Greenfield must return the $10.6 million paid to him because Greenfield had acted as an agent without first procuring a license as required by the Labor Code. One cause of action alleged a violation of Business and Professions Code section 17200, the unfair competition law (UCL). It alleged that Greenfield had engaged in an unlawful business practice because he did not have the required licensure under the TAA.

■ UCL causes of action "include any unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) "By proscribing 'any unlawful' business practice, '[the UCL] "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law

---

[17] *Styne, supra,* 26 Cal.4th 42, distinguished the commissioner's original exclusive jurisdiction with tribunals having concurrent jurisdiction: "This situation is distinct from that which arises when parties dispute whether an injured person is entitled to one or the other of two *mutually exclusive* kinds of relief in *separate and parallel* fora, e.g., tort damages to be awarded by a court, or statutory benefits for an industrial injury administered by the Workers' Compensation Appeals Board. In that instance, the two tribunals have *concurrent* jurisdiction *to determine their subject matter jurisdiction* over the dispute, and the first forum invoked has jurisdiction, to the exclusion of the other, to finally determine if the facts give it, rather than the other, jurisdiction over the merits of the controversy. [Citations.]" (*Id.* at p. 55, fn. 6.)

makes independently actionable. [Citation.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527]; accord, *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1153 [93 Cal.Rptr.2d 439].)

An act may violate the UCL even if the unlawful practice affects only one victim. (*Allied Grape Growers v. Bronco Wine Co.* (1988) 203 Cal.App.3d 432, 452–453 [249 Cal.Rptr. 872].) **(19)** The UCL has a four-year statute of limitations, which applies even if the borrowed statute has a shorter limitations statute. (Bus. & Prof. Code, § 17208; *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 178–179 [96 Cal.Rptr.2d 518, 999 P.2d 706] (*Cortez*).) "That is because Business and Professions Code section 17208 states that any action to enforce any cause of action under the UCL chapter shall be commenced within four years after the cause of action accrued. [Citation.]" (*In re Vaccine Cases* (2005) 134 Cal.App.4th 438, 458 [36 Cal.Rptr.3d 80] (*Vaccine*).) This language "admits of no exceptions." (*Cortez, supra*, at p. 179.) Thus, for example, in *Cortez*, the Supreme Court held that the plaintiff could bring a UCL cause of action even though the Labor Code statute used as the basis for the UCL cause of action had a shorter statutory limitations period. (*Cortez*, at pp. 178–179.) Thus, the general rule is that a UCL cause of action borrows the substantive portion of the borrowed statute to prove the "unlawful" prong of that statute, but not the limitations procedural part of the borrowed statute.

As we explain below, this general rule is not applicable here. We are presented with something more than a "procedural" limitations period. The applicable provisions of the TAA vest exclusive original jurisdiction in the Labor Commissioner and impose a one-year limitations period as a predicate to the assertion of any claim thereunder. These are fundamental parts of the TAA and the assertion of any claim based on a violation of its provision, but pursued under the UCL, is necessarily burdened by this one-year limitations period.

Seyfarth argues that even if it was negligent in allowing the TAA statute to expire prior to filing with the Labor Commissioner, such negligence did not harm Blanks because the statute of limitations for Blanks's UCL cause of action had not expired and that cause of action would have yielded the same recovery as alleged in the first cause of action for violating the TAA. Therefore, Seyfarth argues, as a matter of law, Blanks could not prove causation and damages required by the trial-within-a-trial methodology. We hold that by this argument, Seyfarth unpersuasively seeks to circumvent the comprehensive statutory scheme in which the Legislature has given exclusive original jurisdiction to the Labor Commissioner with regard to TAA claims. (Lab. Code, § 1700.44, subd. (a); *Styne, supra*, 26 Cal.4th at pp. 54–56 & fn. 6; *Buchwald v. Superior Court, supra*, 254 Cal.App.2d at pp. 358–359.)

As discussed above, the commissioner has the exclusive original jurisdiction in the first instance to decide if a controversy arises under the Act. (*Styne, supra*, 26 Cal.4th at pp. 47, 54–60 & fns. 6 & 10.) Labor Code section 1700.44, subdivision (a) requires all " 'controvers[ies]' and 'dispute[s]' between 'parties' to be examined in the first instance by the Commissioner . . . ." (*Styne, supra*, at p. 56.) It permits parties seeking affirmative relief to invoke the superior court's jurisdiction only after the commissioner has first considered the issues. (Lab. Code, § 1700.44, subd. (a).) Labor Code "[s]ection 1700.44 confers a right to appeal *to* the superior court *from* the Labor Commissioner's award . . . ." (*Buchwald v. Katz, supra*, 8 Cal.3d at p. 500.) Unlike other statutes that might be used as the basis for a UCL cause of action, the TAA mandates that cases colorably arising under the TAA *must first* be filed with the commissioner within the one-year statute of limitations period. This is a procedural predicate-filing requirement that cannot be circumvented by recasting a TAA cause of action as a UCL cause of action. Persons, such as Blanks, seeking affirmative relief under the TAA may not invoke the jurisdiction of the superior court until after the commissioner has issued a ruling. This is not a matter of judicial discretion, but is a fundamental rule of procedure. (*Buchwald v. Superior Court, supra*, 254 Cal.App.2d at p. 359.)

▇▇▇ " 'The reference of disputes involving the [A]ct to the Commissioner is *mandatory*. [Citation.] Disputes *must* be heard by the Commissioner, and all remedies before the Commissioner *must* be exhausted before the parties can proceed to the superior court. [Citation.]' [Citations.]" (*Styne, supra*, 26 Cal.4th at p. 54.) The Legislature has determined that it is valuable to have the commissioner first examine TAA claims prior to any judicial consideration because the commissioner's "expertise in applying the Act is particularly significant in cases where, as here, the essence of the parties' dispute is whether services performed were by a talent agency for an artist." (*Styne*, at p. 58.) Thus, the superior court is foreclosed from awarding any relief unless the commissioner has first considered the issue because to do otherwise would usurp the commissioner's original jurisdiction. The TAA statutory scheme creates an absolute bar to plaintiffs who wish to circumvent the presuit requirement of filing first with the commissioner. Even if UCL remedies are cumulative to those available under other statutes (Bus. & Prof. Code, § 17205; e.g., *Janik v. Rudy, Exelrod & Zieff* (2004) 119 Cal.App.4th 930, 942 [14 Cal.Rptr.3d 751] [violation of Lab. Code may be brought under UCL]), and thus cumulative of those under the TAA, a TAA claim must be first brought to the Labor Commissioner.

There can be no argument here that the essence of the underlying case involves a dispute as to whether the relationship between Blanks and Greenfield was controlled by the TAA. The only possible way to satisfy the broad jurisdictional boundaries of the TAA is to require that this issue first be

examined by the commissioner, who would determine if Greenfield procured employment for Blanks. (Lab. Code, § 1700.44, subd. (a).) This, and many other issues involved in the *Blanks v. Greenfield* case, including whether or not severance (discussed *post*) is appropriate, are the precise types of issues that the TAA demands initially be examined by the commissioner, who has special competence in rendering such decisions. (Cf. *Styne, supra*, 26 Cal.4th at p. 61.) Seyfarth may not plead around the TAA by stating the requested relief alternatively as a UCL cause of action.

Our result is buttressed by our prior case, *Vaccine, supra*, 134 Cal.App.4th 438. In *Vaccine*, parents and their children sued vaccine manufacturers and other related defendants after the children received vaccines containing a mercury-based preservative. (*Id.* at p. 445.) The plaintiffs alleged that the defendants violated the Safe Drinking Water and Toxic Enforcement Act of 1986, Health and Safety Code section 25249.5 et seq. (Proposition 65). (*Vaccine, supra*, at p. 445.) This statutory scheme permitted authorized public agencies to bring actions to enforce Proposition 65. However, private actions were permitted under Proposition 65 if two requirements were met: (1) the private action was commenced 60 days after the individual had given notice of an alleged violation to the governmental agency in whose jurisdiction the violation was said to have occurred, accompanied by a certificate of merit; and (2) there was no pending public action. (134 Cal.App.4th at pp. 453–454, citing Health & Saf. Code, § 25249.7, subd. (d).) We noted that the plaintiffs' cause of action under Proposition 65 "alleges unfair competition that is 'unlawful' rather than 'unfair' or 'deceptive.' " (*Vaccine, supra*, at p. 457.)

In *Vaccine*, we addressed the plaintiffs' argument that they could proceed with their UCL cause of action against three defendants who had *not* been named in their Proposition 65 cause of action, even though those defendants had not been served with 60-day notices. (*Vaccine, supra*, 134 Cal.App.4th at pp. 457–459.) We held that the plaintiffs' failure to comply with the prenotice requirement precluded the plaintiffs' UCL cause of action. We stated in part, "*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra*, 20 Cal.4th 163 (*Cel-Tech*) prohibits plaintiffs from recasting their Proposition 65 action as an unfair competition action. *Cel-Tech* holds that where the Legislature has specifically concluded that no action should lie, the plaintiff cannot use the unfair competition law to ' "plead around" ' an ' "absolute bar to relief." ' [Citation.] The question is whether plaintiffs' failure to comply with the presuit notice required to bring an action under [Proposition 65] is such an 'absolute bar to relief.' We believe that it is. [¶] 'To forestall an action under the unfair competition law, another provision must actually "bar" the action or clearly permit the conduct.' (*Cel-Tech, supra*, . . . at p. 183.) Failure to provide 60-day notices which comply with requirements of [Proposition 65] does bar plaintiffs' action. [Citation.] . . . [T]he Legislature did specifically conclude that 'no action should lie' unless plaintiffs provided

a 60-day notice required by [Health and Safety Code section] 25249.7, subdivision (d)(1). (*Cel-Tech*, at p. 182.) Plaintiffs' failure to comply with [the 60-day notice provision], bars their Proposition 65 action against these three defendants." (*Vaccine, supra*, at p. 458, fn. omitted.)

We noted in *Vaccine* that barring the plaintiffs' UCL cause of action was consistent with the purposes of the 60-day notice requirement, that " 'is to encourage public enforcement, thereby avoiding the need for a private lawsuit altogether, and to encourage resolution of disputes outside the courts.' [Citation.] Proposition 65 conditioned a private right of action for violation of [it] on compliance with these substantive provisions. To allow plaintiffs to bring a UCL action against these three defendants without complying with [the 60-day notice provision], would frustrate the purpose of this requirement and would nullify its enactment." (*Vaccine, supra*, 134 Cal.App.4th at p. 459.)

We also noted in *Vaccine* that "[t]he *Cel-Tech* decision considered a UCL action based on 'unfair' business practices, and not on 'unlawful' business practices. The California Supreme Court has expressly not decided whether this rule applies to the latter 'unlawful' business practices. (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 827–828 [135 Cal.Rptr.2d 1, 69 P.3d 927].) We believe, however, that given the purpose of the [60-day notice provision contained in Health and Safety Code] section 25249.7, subdivision (d), . . . the *Cel-Tech* rule applies to this appeal in which plaintiffs have alleged an 'unlawful' business practice." (*Vaccine, supra*, 134 Cal.App.4th at p. 458, fn. 4.)

 As stated above, the TAA includes an unambiguous requirement that actions colorably arising under the TAA, i.e., where the dispute "plausibly pertains to the subject matter of the Act" (*Styne, supra*, 26 Cal.4th at p. 59, fn. 10), must first be presented to the commissioner within one year. The failure to comply with this procedural requirement is an absolute bar to Blanks's UCL cause of action.

*Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365 [36 Cal.Rptr.3d 31] (*Caliber*) does not lead to a contrary result. *Caliber* addressed another Labor Code act's prefiling requirements and the UCL, but its procedural posture distinguishes it from *Vaccine* and the case before us. "[T]he Labor and Workforce Development Agency (LWDA) and its constituent departments and divisions—are authorized to assess and collect civil penalties for specified violations of the Labor Code committed by an employer. [Citation.]" (*Caliber, supra*, at p. 370, fn. omitted.) The Labor Code Private Attorneys General Act of 2004 (§ 2698 et seq.), permits, "as an alternative, an aggrieved employee to initiate a private civil action on behalf

of himself or herself and other current or former employees to recover civil penalties if the LWDA does not do so. . . . Before an employee may file an action seeking to recover civil penalties for violations of any of the Labor Code provisions enumerated in section 2699.5, however, he or she must comply with the [Private Attorneys General Act's] administrative procedures as set forth in section 2699.3, subdivision (a), which include providing notice to the LWDA and the employer and waiting a prescribed period of time to permit the LWDA to investigate and to decide whether to cite the employer for the alleged violations." (*Caliber, supra,* at p. 370.)

In *Caliber,* "aggrieved employees . . . filed a wage-and-hour action against their former employer seeking, among other remedies, civil penalties for violations of several of the Labor Code provisions specified in section 2699.5. The employees did not allege they had satisfied the [Labor Code Private Attorneys General Act's] prefiling notice and exhaustion requirements before initiating their lawsuit; and their operative complaint does not mention [that act], let alone request remedies under it." (*Caliber, supra,* 134 Cal.App.4th at p. 370.)

*Caliber* distinguished between "civil penalties" recoverable under the Labor Code Private Attorneys General Act of 2004 and other remedies (wages and interest and statutory penalties) authorized in the Labor Code. (*Caliber, supra,* 134 Cal.App.4th at pp. 377–378.) *Caliber* first held that the prefiling notice and exhaustion requirements only applied to "civil penalties," not to other damages and thus, those causes of action that asked for civil penalties (exclusively or combined with requests for other types of relief) must first be brought to the LWDA (Labor and Workforce Development Agency). (*Id.* at pp. 378, 383, 386.)[18] It then held that the UCL cause of action survived a demurrer and was not subject to the prefiling notice requirements because it was not asking for civil penalties. (134 Cal.App.4th at p. 386.) Thus, in *Caliber* the UCL cause of action survived because the prenotice requirement did not apply to the plaintiff's case, as the statute at issue (the Labor Code Private Attorneys General Act) was designed in that manner. In contrast, as discussed above, the TAA is designed to mandate hearings before the commissioner for all requests of relief that colorably arise under the Act.

Because Blanks could not utilize the UCL cause of action to avoid the commissioner's exclusive primary jurisdiction requiring the timely filing of a petition with the commissioner, Seyfarth's causation and damages argument

---

[18] With regard to those causes of action that were "hybrid," i.e., those causes of action that sought both "civil penalties" and other remedies, *Caliber* directed the trial court to strike the demands for civil penalties. (*Caliber, supra,* 134 Cal.App.4th at p. 385.)

premised upon the suggestion that the UCL cause of action would have provided the same remedy is simply wrong.

> D. *The trial court prejudicially erred in refusing to instruct that the agreement between Blanks and Greenfield was subject to the doctrine of severability.*

Seyfarth contends that the contract between Blanks and Greenfield was subject to the doctrine of severability. This contention is persuasive and because the instructions did not comport with the law in this regard, reversal of the judgment is required.

Blanks's legal malpractice lawsuit against Seyfarth was based upon the theory that he would have been successful in the underlying case against Greenfield had Seyfarth not placed its interests above Blanks's. Blanks argued that had Seyfarth timely filed a petition with the Labor Commissioner rather than delaying the filing of the TAA petition to inflate attorney's fees, Blanks would have been entitled to recover all sums Blanks paid Greenfield because Greenfield was not a licensed talent agent, i.e., had Seyfarth timely filed with the commissioner, Blanks would have obtained a disgorgement award from the commissioner of approximately $10.6 million dollars.

Seyfarth did not concede liability. However, it argued that even *if* the Blanks/Greenfield arrangement was tainted with illegality because Greenfield was not a licensed talent agent, and even *if* a TAA petition had been timely filed, the doctrine of severability of contracts applied and Blanks was not entitled to disgorgement of *all* sums paid. In making this argument, Seyfarth noted that Greenfield rendered many nonagent services. Thus, according to Seyfarth, even *if* it was liable, Greenfield's agent activities (which would have been illegal) had to be severed from the nonagent activities (which did not violate the TAA), and any recovery to Blanks in the legal malpractice case was limited to those sums attributable to Greenfield's agent activities.

The trial court rejected this argument. The trial court refused to instruct on the doctrine of severability. Rather, the trial court instructed the jury with special instruction No. 9, which stated that under the TAA, a contract under which an unlicensed party procured or attempted "to procure employment for an artist . . . [was] void ab initio and the party procuring the employment is barred from recovering commissions for any activities . . . ."

 This was error. A year ago, in *Marathon, supra,* 42 Cal.4th 974, the Supreme Court examined the TAA, the role of agents and managers, and the

doctrine of severability.[19] *Marathon* recognized that it is often unclear as to whether a person is acting as an artist's agent or in some other capacity, such as a manager. (42 Cal.4th at p. 980.) *Marathon* held, however, that the doctrine of severability of contracts, as codified in Civil Code section 1599, applies to contracts involving such arrangements. (*Marathon, supra,* at pp. 980–981.) Thus, if an unlicensed person renders procurement services that require a license under the TAA and also renders nonprocurement services, that person may be entitled to compensation for those acts that did not involve unlawful procurement. In such cases, the Labor Commissioner hearing the dispute "is empowered to void contracts in their entirety," however, the commissioner is not "obligated to do so . . . . [Rather, the Labor Commissioner has] the ability to apply equitable doctrines such as severance to achieve a more measured and appropriate remedy where the facts so warrant." (42 Cal.4th at p. 995.)

 "In deciding whether severance is available, [*Marathon* has] explained '[t]he overarching inquiry is whether " 'the interests of justice . . . would be furthered' " by severance.' [Citation.] 'Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.' [Citations.]" (*Marathon, supra,* 42 Cal.4th at p. 996.) The analysis is case specific. (*Id.* at p. 998.) Further, the doctrine of severability can apply even if the unlicensed person "receives an undifferentiated right to a certain percentage of the client's income stream." (*Id.* at p. 997.)

Here, instruction No. 9 was given over Seyfarth's objection and differed significantly from the instructions proposed by Seyfarth that would have included the concept of severability. Instruction No. 9 removed from the jury all consideration of severability. It informed the jury that the contract between Blanks and Greenfield was "void ab initio [and Greenfield was] barred from recovering commissions for any activities under the contract[, and a]ll recovery [was to be] denied even when the majority of [Greenfield's] activities did not require a talent agency license and the activities which did require a license were minimal and incidental."

---

[19] When this appeal was originally briefed, *Marathon, supra,* 42 Cal.4th 974 had not been decided by the Supreme Court. In the original briefing, the parties argued over whether the doctrine of severability could be applied to claims made pursuant to the TAA and they discussed at length a number of cases, including *Marathon Entertainment, Inc. v. Blasi* (B179819), review granted September 20, 2006, S145428, that had been filed and certified for publication on June 23, 2006. We stayed the appellate proceedings because the Supreme Court granted review of the Court of Appeal decision on September 20, 2006. After the Supreme Court rendered its opinion, the parties submitted supplemental briefing.

This instructional error contravenes the law and usurped the jury's responsibility to determine causation and damages. (See *Mattco Forge, Inc. v. Arthur Young & Co., supra*, 52 Cal.App.4th at p. 838 [discussing when instructional error requires reversal].) It was for the jury to decide what the commissioner would have done had a petition been timely filed. Had the case been timely presented to the commissioner, she would have had to make a case-specific determination whether or not the TAA required Greenfield to hold a license, if the entirely or parts of the Blanks/Greenfield agreement were enforceable, if the purpose of the contract was so tainted with illegality that Blanks was entitled to a complete refund of all monies paid, and if the illegal aspects of the contract could be extirpated by severance. (*Marathon, supra*, 42 Cal.4th at p. 996; *Viner v. Sweet, supra*, 30 Cal.4th at p. 1241 [requiring plaintiffs in legal malpractice case to prove that but for the defendant's alleged negligence, the plaintiff would have obtained a more favorable judgment or settlement in the action in the underlying case]; accord, *Mattco Forge, Inc. v. Arthur Young & Co., supra*, at pp. 841–844; *DiPalma v. Seldman, supra*, 27 Cal.App.4th at pp. 1506–1507; *Piscitelli v. Friedenberg, supra*, 87 Cal.App.4th at p. 970.) Thus, in the trial within a trial, it was the jury's responsibility to determine how a reasonable commissioner would have addressed severability, had Seyfarth timely filed a TAA petition with the commissioner.

Blanks argues on appeal that any instructional error on severability was ameliorated because after special instruction No. 9 was read to the jury, Seyfarth argued that the jury could award nothing and the trial court instructed that, "The Labor Commissioner considers both equitable relief and legal remedies." However, neither Seyfarth's short argument nor this single-line instruction could extinguish the harm of instruction No. 9, which precluded the jury from considering severability or alternative remedies. This incorrect instruction also infected the presentation of evidence and formed the theories and arguments presented. Both Seyfarth and Blanks were harmed by the roadmap that resulted.

The trial court permitted Blanks, over objection, to elicit some testimony from witnesses that Blanks was entitled to disgorgement of the entire $10.6 million. Further, Blanks repeatedly argued to the jury that he was entitled to recover all sums he had paid Greenfield. For example, Blanks argued the TAA demanded that "[a]ll recovery to personal managers is denied even when the majority of the manager's activities did not require a talent agent's license and activities which did require a license were minimal and incidental." However, neither Seyfarth nor Blanks sufficiently presented evidence or argument relating to whether the entire Blanks/Greenfield agreement was tainted with illegality because Greenfield was unlicensed. While there was evidence of the many activities undertaken by Greenfield, there was scant evidence as to the value of these services or the time spent on them. There

was virtually no evidence about how the 16 checks were calculated. The record did not definitively disclose whether a talent agency license was required for the NCP deal. The parties did not fully address whether it was equitable or feasible to sever Greenfield's unlicensed procurement activities from the lawful, nonprocurement ones. They did not discuss if the income Greenfield derived was attributable to the central purpose of the Blanks/Greenfield agreement, or if Greenfield's talent agent activities permeated all other services rendered. The parties did not discuss the relevance of the fact that Greenfield was entitled to a percentage of Blanks's total income and how this undifferentiated income affects the severability question.[20]

Lastly, it appears the jury accepted Blanks's all-or-nothing approach because the jury awarded Blanks the exact amount he had paid to Greenfield—$10,634,542.48—thereby finding that had Seyfarth timely filed a petition with the commissioner, the commissioner would have awarded Blanks that sum.[21]

---

[20] We find unpersuasive Seyfarth's argument that it is entitled to judgment as a matter of law when the doctrine of severability of contracts is applied to this case. Seyfarth proposes that even if it is liable to Blanks, Blanks has failed to prove he would have obtained from Greenfield more than $250,000 (the amount of the settlement). Seyfarth asserts it is entitled to judgment because Greenfield's agent activities are worth less than the settlement, and thus, Blanks has failed to prove causation and damages. However, the evidence about the value of Greenfield's services is conflicting and incomplete. Further, contrary to Seyfarth's request, we will not bind Blanks to a statement he made in a motion in limine made in an entirely different context.

Seyfarth's assertion that it is entitled to judgment as a matter of law on the intentional tort causes of action also is not persuasive. Seyfarth fails to explain how severability destroys Blanks's arguments that Seyfarth concealed from Blanks that a TAA petition had not been filed even though promises had been made to the contrary and that Seyfarth breached its fiduciary duty by churning the case to inflate attorney's fees.

[21] In retrospect, it is evident that Blanks's strategy is weakened by the holding in *Marathon, supra*, 42 Cal.4th 974, that the doctrine of severability applies to TAA claims. But, at the time Blanks pursued his trial strategy, *Marathon* had not been decided and Blanks's position was supported by some Labor Commissioner decisions that had concluded "severance is never available to permit partial recovery of commissions for managerial services that required no talent agency license. [Citations.]" (42 Cal.4th at pp. 995–996.) It was only when the Supreme Court decided *Marathon* that Blanks's trial strategy was totally undermined. (*Id.* at p. 996 ["the Labor Commissioner's assessment . . . is mistaken . . . . And any view that it would be better policy if the Act stripped the Labor Commissioner (and the superior courts in subsequent trials de novo) of the power to apply equitable doctrines such as severance would be squarely at odds with the Act's text, which contains no such limitation."].)

Citing *Watenpaugh v. State Teachers' Retirement* (1959) 51 Cal.2d 675, 680 [336 P.2d 165] (discussing invited error) and *Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 166 [143 Cal.Rptr. 633] (same), Seyfarth suggests that Blanks chose a course of action and may not make contrary factual or legal arguments on appeal. Seyfarth also argues that Blanks had the burden of proof in the trial court and if evidence is missing from the record, Blanks is to blame for that hole. As Seyfarth notes, we often do not permit parties to retry cases on theories they could have presented in the trial court. (Cf. *JRS Products, Inc. v.*

Thus, the trial court's instructional error relating to the doctrine of severability infected the entire trial and the judgment must be reversed.[22]

 E. *On an in limine motion, the trial court correctly concluded that the discovery rule does not apply in this case. However, the trial court exceeded its authority when it also held that Seyfarth was negligent as a matter of law.*

 1. *Additional facts.*

One theory presented by Seyfarth was that it was not negligent because the TAA one-year statute of limitations can be extended by the discovery rule, often referred to as the delayed accrual rule. In his motion in limine No. 10, Blanks moved to "preclude Defendants . . . from introducing any evidence of . . . delayed accrual of the statute of limitations applicable to the Talent Agencies Act."

The trial court conducted an Evidence Code section 402 hearing during which the sole witness was defense expert Edwin McPherson. He opined that Seyfarth's reliance upon the discovery rule to extend the statute of limitations did not fall below the standard of care. At the conclusion of the hearing, Blanks asked the trial court to prevent Seyfarth from relying on the delayed discovery rule and additionally to conclude, as a matter of law, that Seyfarth breached the applicable standard of care.

The trial court granted Blanks's motion ruling that "the concept of delayed accrual does not apply in this case [because it] applies when the statute of limitations on a violation or a cause of action has run, and then there's a discovery down the road of . . . some malfeasance or facts that weren't known, and at that point the statute of limitations is actually . . . 'revived . . . .' " The court continued, by stating that here, Blanks had learned in August or September 1999 that Greenfield was unlicensed and at that time, the one year had not expired. Thus, the trial court ruled that the discovery rule did not apply in this case.

---

*Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178 [8 Cal.Rptr.3d 840].) However, waiver and estoppel are equitable concepts. It is inequitable to hold Blanks to the trial strategy he formulated prior to the Supreme Court's 2008 decision in *Marathon, supra,* 42 Cal.4th 974. Unlike *Estate of Swetmann* (2000) 85 Cal.App.4th 807 at pages 822 to 823 [102 Cal.Rptr.2d 457], where the appellate court directed judgment for the appellants, here the entire story relevant to the issues is not in the record. There are many additional facts relevant to severability that will determine the outcome.

[22] On remand the trial court must present to the jury instructions that correctly articulate the law on severance, including that the commissioner has equitable powers to consider if the central purpose of the contract is tainted with illegality.

After granting the motion, the trial court went on to rule "as a matter of law [that Seyfarth's and Lancaster's actions] fell below the standard of care when they missed the [TAA] statute of limitations . . . ." The court ordered that the professional negligence claim be tried on the issues of causation and damages alone. Consistent with this ruling, the trial court instructed the jury that, as a matter of law, Seyfarth breached its duty to use the care and skill of an attorney.[23]

> 2. *The discovery rule cannot extend the TAA statute of limitations in this case.*

Seyfarth's contention that the trial court erred in ruling that the TAA statute of limitations could not be extended by the discovery rule is unpersuasive.

"[I]n some instances, the accrual of a cause of action in tort is delayed until the plaintiff discovered (or reasonably should have discovered or suspected) the factual basis for his or her claim. [Citation.]" (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1248 [7 Cal.Rptr.3d 576, 80 P.3d 676]; see also *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [27 Cal.Rptr.3d 661, 110 P.3d 914]; *Samuels v. Mix* (1999) 22 Cal.4th 1, 9 [91 Cal.Rptr.2d 273, 989 P.2d 701]; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397–398 [87 Cal.Rptr.2d 453, 981 P.2d 79].) The discovery rule postpones accrual of the cause of action. It "may be expressed by the Legislature or implied by the courts. [Citation.]" (*Norgart v. Upjohn Co., supra,* at p. 397; see *Samuels v. Mix, supra,* at p. 9.)

The discovery rule is designed to protect plaintiffs who were unaware of their claims (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 826–827 [195 Cal.Rptr. 421]) and " 'to prevent tort claims from expiring before they are discovered . . . .' " (*Lambert v. Commonwealth Land Title Ins. Co.* (1991) 53 Cal.3d 1072, 1079 [282 Cal.Rptr. 445, 811 P.2d 737].) It is inappropriate to apply the rule when plaintiffs have ample time after discovery to protect their rights by filing a civil lawsuit, or in this case, to file a TAA petition. (Cf. *Lobrovich v. Georgison* (1956) 144 Cal.App.2d 567, 573–574 [301 P.2d 460] ["If there is still ample time to institute the action within the statutory period after the circumstances inducing delay have ceased to operate, the plaintiff who failed to do so cannot claim an estoppel."].)

---

[23] The trial court instructed the jury: "The Court has found as a matter of law that Seyfarth Shaw, LLP and William H. Lancaster breached the duty to use the care and skill ordinarily exercised in like cases by reputable members of the profession practicing in the same or similar locality under similar circumstances by not filing the Petition to Determine Controversy with the Labor Commissioner within the Statute of Limitations."

When the issue is accrual, belated discovery is usually a question of fact, but may be decided as a matter of law when reasonable minds cannot differ. (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1320 [64 Cal.Rptr.3d 9].)

Here, Blanks learned that Greenfield was unlicensed in August or September 1999. (See fn. 5, *ante*.) Blanks retained Seyfarth in October 1999. Thus, there was plenty of time to file the TAA petition before the one-year TAA statute of limitations would have expired on the first check dated December 29, 1998. In fact, Lancaster admitted he knew that with regard to the TAA statute of limitations, the critical date was the date each payment was made to Greenfield and he knew the commissioner had original jurisdiction over Blanks's TAA claim. Seyfarth has not cited one case where the discovery rule has been applied to a situation where the plaintiff made a deliberate tactical decision to delay filing a lawsuit knowing about the limitations period and purposefully trying to circumvent it. Thus, the trial court correctly concluded that in this case, the discovery rule had no applicability and the court's ruling on the motion in limine with regard to delayed accrual was correct.

### 3. *The trial court exceeded its authority when it addressed an issue that was not presented in the motion in limine.*

As noted above, the in limine motion solely addressed delayed discovery. However, after addressing the specific issue presented, the trial court went on to hold that Seyfarth was negligent as a matter of law because its actions fell below the standard of care. On appeal, Seyfarth persuasively argues the trial court exceeded its authority in ruling that Seyfarth was negligent as a matter of law.

"In limine motions are designed to facilitate the management of a case, generally by deciding difficult evidentiary issues in advance of trial. ' "The usual purpose of motions *in limine* is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party. A typical order *in limine* excludes the challenged evidence and directs counsel, parties, and witnesses not to refer to the excluded matters during trial. [Citation.] 'The advantage of such motions is to avoid the obviously futile attempt to "unring the bell" in the event a motion to strike is granted in the proceedings before the jury.' [Citation.]" ' [Citation.] What in limine motions are *not* designed to do is to replace the dispositive motions prescribed by the Code of Civil Procedure." (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593 [71 Cal.Rptr.3d 361].) Although trial courts may exercise their inherent powers to permit nontraditional uses of motions in limine (*id.* at

p. 1595),[24] when used in such fashion they become substitutes for other motions, such as summary judgment motions, thereby circumventing "procedural protections provided by the statutory motions or by trial on the merits; they risk blindsiding the nonmoving party; and, in some cases, they could infringe a litigant's right to a jury trial. (Cal. Const., art. I, § 16.)" (*Amtower v. Photon Dynamics, Inc., supra,* at p. 1594.)

Here, when the trial court ruled on motion in limine No. 10, the only issue presented was whether Seyfarth could present evidence as to whether the discovery rule applied to Blanks's TAA claims. However, the trial court exceeded the scope of the motion and made an evidentiary ruling that had critical ramifications. The trial court held, and later instructed, that Seyfarth was negligent, as a matter of law. This ruling did not address the single issue presented in the motion in limine. The ruling also was contrary to the only expert evidence that had been presented, by McPherson, who testified that Lancaster's action did *not* fall below the standard of care.

Further, the issue of negligence in a legal malpractice case is ordinarily an issue of fact. (*Dawson v. Toledano, supra,* 109 Cal.App.4th at p. 396 [whether attorneys breached their duty is ordinarily question of fact for the jury]; accord, *Unigard Ins. Group v. O'Flaherty & Belgum, supra,* 38 Cal.App.4th at pp. 1237–1238; *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1094–1095 [41 Cal.Rptr.2d 768].) The trial court's ruling did not give the parties an opportunity to address the facts required to assess negligence, as would have been the case had the issue been raised on an in limine motion, a motion for summary judgment or adjudication.

The prejudice from the trial court's ruling was evident. (*Mattco Forge, Inc. v. Arthur Young & Co., supra,* 52 Cal.App.4th at p. 838 [discussing when instructional error is prejudicial].) Consistent with its ruling that Seyfarth was negligent as a matter of law, the trial court substantially curtailed Seyfarth's presentation of evidence during trial. The court effectively denied Seyfarth the ability to explain its actions and present its position that it had met the standard of care and had made an informed decision as to a course of conduct based upon an intelligent assessment of the problem. Seyfarth was precluded from fully explaining its rationale for its trial strategy in handling the *Blanks v. Greenfield* lawsuit, including that discovery was crucial to develop

---

[24] Compare Superior Court of Los Angeles County, Local Rules, rule 8.92(b) (in limine motions are not to be used for purpose of seeking summary judgment or the summary adjudication of issues) with *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 26 to 27 [61 Cal.Rptr.2d 518] (in limine motion may be treated as demurrer, judgment on the pleadings, or nonsuit and address purely legal issue) and *Mechanical Contractors Assn. v. Greater Bay Area Assn.* (1998) 66 Cal.App.4th 672, 676 to 677 [78 Cal.Rptr.2d 225] (motion in limine to exclude all evidence functional equivalent to demurrer or motion for judgment on the pleadings).

all theories in the multiple pled causes of action and to defend Greenfield's $49 million cross-complaint. Seyfarth's representation of Blanks preceded the rulings in *Greenfield v. Superior Court, supra,* 106 Cal.App.4th 743 and *Marathon, supra,* 42 Cal.4th 974, occurred after the rulings in *Buchwald v. Katz, supra,* 8 Cal.3d 493, *Garson v. Div. of Labor Law Enforcement, supra,* 33 Cal.2d 861, *REO Broadcasting Consultants v. Martin, supra,* 69 Cal.App.4th 489, *Buchwald v. Superior Court, supra,* 254 Cal.App.2d 347, and *Waisbren v. Peppercorn Productions, Inc., supra,* 41 Cal.App.4th 246, and happened concurrently with the filing of the Court of Appeal opinion on February 8, 2000, in *Styne v. Stevens.* All of these cases addressed aspects of the underlying case and were relevant to Seyfarth's legal analysis; yet, the trial court's in limine ruling limited Seyfarth's ability to discuss their relevancy. By prohibiting Seyfarth from making a complete presentation that would have included extensive testimony from Lancaster and defense experts, the trial court denied Seyfarth an opportunity to provide an explanation for its tactical decision to the jury and exceeded the trial court's powers. (*Unigard Ins. Group v. O'Flaherty & Belgum, supra,* 38 Cal.App.4th at p. 1239 ["In negligence cases arising from the rendering of professional services, as a general rule the standard of care against which the professional's acts are measured remains a matter peculiarly within the knowledge of experts. Only their testimony can prove it, unless the lay person's common knowledge includes the conduct required by the particular circumstances."]; *Piscitelli v. Friedenberg, supra,* 87 Cal.App.4th at pp. 985–986 [jury entitled to expert testimony on the standard of care and the propriety of the actions of the attorney].)[25] If Blanks wished to obtain a ruling prior to trial that Seyfarth was negligent as a matter of law, Blanks should have raised the issue in a motion for summary judgment or summary adjudication where all relevant facts could be assessed.

We hold that the trial court's ruling on the motion in limine with regard to delayed accrual was correct. However, the trial court exceeded its authority by ruling that Seyfarth was negligent as a matter of law, which is an issue that must be decided upon a full development of the facts either upon the proper motion or by the jury. The trial court's ruling that Seyfarth was negligent as a matter or law, and the instruction to the jury to that effect, are other reasons mandating reversal.[26]

---

[25] However, experts may not be called upon to testify as to what the reasonable trier of fact in the underlying case would have done. (*Piscitelli v. Friedenberg, supra,* 87 Cal.App.4th at pp. 972–974.)

[26] The instructional error also affected the intentional tort verdicts and the punitive award.

### F. On remand, the issue of the "judgmental immunity doctrine" is likely to be addressed.

On remand, it is expected that in response to Blanks's assertion that Seyfarth was negligent, Seyfarth will claim that it is protected by the "judgmental immunity doctrine." (See Code Civ. Proc., § 43.) This doctrine, although often commonly referred to as an "immunity," is not an immunity at all.

█ In the realm of tort liability, immunities protect a class of defendants based upon public policy. An "immunity" is "[a]ny exemption from a duty [or] liability . . . ." (Black's Law Dict. (8th ed. 2004) p. 765, col. 2.) It " 'avoids liability in tort under all circumstances, within the limits of the immunity itself; it is conferred, not because of the particular facts, but because of the status or position of the favored defendant; and it does not deny the tort, but [rather] the resulting liability. . . .' [Citation.]" (*Whitcombe v. County of Yolo* (1977) 73 Cal.App.3d 698, 704–705 [141 Cal.Rptr. 189].) When the law grants an immunity, it does not mean that the defendant's conduct is not tortious, but rather that the defendant is absolved from liability. For example, an immunity exempts public employees from liability who, in the exercise of their discretion, injure another. (Gov. Code, § 820.2.) Another immunity protects real property owners from liability for injury or death "that occurs upon that property during the course of or after the commission of [specified] felonies . . . by the injured or deceased person." (Civ. Code, § 847.)

█ In contrast, when courts discuss what has come to be called the "judgmental immunity doctrine," they are actually addressing the factual issue as to whether an attorney breached the standard of care. The judgmental immunity doctrine relieves an attorney from a finding of liability even where there was an unfavorable result if there was an "honest error in judgment concerning a doubtful or debatable point of law . . . ." (*Davis v. Damrell* (1981) 119 Cal.App.3d 883, 887 [174 Cal.Rptr. 257]; see also *Smith v. Lewis, supra*, 13 Cal.3d at p. 359; *Aloy v. Mash* (1985) 38 Cal.3d 413, 417–419 [212 Cal.Rptr. 162, 696 P.2d 656]; *Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 36–38 [123 Cal.Rptr.2d 555].) This doctrine recognizes that an attorney does not "ordinarily guarantee the soundness of his [or her] opinions and, accordingly, is not liable for every mistake he [or she] may make in his [or her] practice." (*Smith v. Lewis, supra*, at p. 358.)

In order to prevail on this theory and escape a negligence finding, an attorney must show that there were unsettled or debatable areas of the law

that were the subject of the legal advice rendered and this advice was based upon "reasonable research in an effort to ascertain relevant legal principles and to make an informed decision as to a course of conduct based upon an intelligent assessment of the problem." (*Smith v. Lewis, supra,* 13 Cal.3d at p. 359; see *Village Nurseries v. Greenbaum, supra,* 101 Cal.App.4th at pp. 37–38.) Because attorneys must "possess knowledge of those plain and elementary principles of law which are commonly known by well informed attorneys," (*Smith v. Lewis, supra,* at p. 358; accord, *Dawson v. Toledano, supra,* 109 Cal.App.4th at p. 397), as part of the analysis, the attorney must demonstrate that he or she has taken steps to "discover those additional rules of law which, although not commonly known, may readily be found by standard research techniques. [Citations.]" (*Smith v. Lewis, supra,* at p. 358.) It is not sufficient that the attorney exercise his or her best judgment; rather, that judgment must be consistent with the standard of practice.

■ We note that when the issue of Seyfarth's negligence is raised upon remand, Seyfarth will have to be able to show that it made a reasoned choice to delay filing Blanks's TAA petition and it was a prudent trial strategy to risk losing the TAA claims when the basis for Seyfarth's strategy was a number of uncertain and untested legal hypothesis that equal or greater results could be achieved for Blanks outside the commissioner's arena. "[A]n attorney's obligation is not satisfied by simply determining that the law on a particular subject is doubtful or debatable . . . ." (*Horne v. Peckham* (1979) 97 Cal.App.3d 404, 416 [158 Cal.Rptr. 714], disapproved on other grounds in *ITT Small Business Finance Corp. v. Niles* (1994) 9 Cal.4th 245, 255–256 [36 Cal.Rptr.2d 552, 885 P.2d 965].) Even if the law is unsettled, an attorney's decision must be informed, based upon an intelligent evaluation of the case. "In other words, an attorney has a duty to *avoid* involving his [or her] client in murky areas of the law if research reveals alternative courses of conduct. At least he [or she] should inform his [or her] client of uncertainties and let the client make the decision." (*Horne v. Peckham, supra,* at p. 416.) Although attorneys have wide latitude in selecting strategy (*Kirsch v. Duryea* (1978) 21 Cal.3d 303, 309 [146 Cal.Rptr. 218, 578 P.2d 935]), Seyfarth will have the burden to explain why its choice to delay filing a TAA petition was based upon a rational, professional judgment, that would have been made by other reputable attorneys in the community under the same or substantially similar circumstances.

Upon remand, the parties will be free to present all relevant facts regarding whether Seyfarth met the standard of care.

## IV.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court. The parties are to bear their own costs on appeal.

Croskey, Acting P. J., and Kitching, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 20, 2009, S171675. George, C. J., did not participate therein.