Filed 11/24/21  Samuels v. Hamrick & Evans CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SETH SAMUELS et al.,<br><br>        Plaintiffs and Respondents,<br>v.<br>HAMRICK & EVANS, LLP et al.,<br><br>        Defendants and Appellants. | A158688, A158878<br><br>(City & County of San Francisco Super. Ct. No. CGC-13-534626) |

In 2013, Seth Samuels, his brothers, and their companies (plaintiffs) filed this malpractice action against their former attorneys, Kenneth Greene, Raymond Hamrick, and the law firm of Hamrick & Evans (defendants). Plaintiffs sought damages for defendants' negligent prosecution of an action to collect a $1.8 million judgment that plaintiffs had obtained against Pinewave Construction, Inc. in 2005.  Like the parties, we refer to this judgment debtor as PW1 in order to distinguish it from its related company, Pinewave Commercial Construction, Inc. (PW2).

Plaintiffs' malpractice case was tried to the court in late 2018.  In a 90-page statement of decision, the trial court found that defendants committed malpractice and awarded plaintiffs damages totaling $4,502,807, plus interest.  On appeal, defendants contend the judgment against them must be reversed because the judgment against PW1 was not collectible.

1

Alternatively, defendants contend the trial court erred by awarding prejudgment interest. We affirm the judgment but remand this case for recalculation of plaintiffs' damages.

## FACTUAL BACKGROUND

We base our background summary on the facts and evidence set forth in the statement of decision.

### I. Plaintiffs' Judgment Against PW1

In 2002, plaintiffs and PW1 executed a contract pursuant to which PW1 agreed to be the general contractor for plaintiffs' construction project on Noriega Street in San Francisco. PW1 is owned by Eric Au, Edwin Law, Gavin Lam, and Lawrence Lee (the PW Owners).

In December 2003, when the Noriega project was near completion, plaintiffs notified PW1 about significant construction defects. PW1 "tried unsuccessfully" to correct the defects. When plaintiffs refused to make further payments for the attempted corrections, PW1 stopped work on the project and the PW Owners "immediately" took the following actions: (1) they caused PW1 to pay them a shared dividend in the amount of $200,000 by drawing on a line of credit; (2) they set up PW2 and began transferring assets and projects to PW2; (3) they caused PW1 to "pay all of PW2s overhead, salaries, rents and expenses."

In May 2004, PW1 filed a demand for arbitration of its dispute with plaintiffs. That same month, it entered into a construction contract with a related company, Grove Avenue Business Park LLC (Grove). PW Owner Lee signed the contract on behalf of PW1 and PW Owner Law signed for Grove. The Grove project was completed and sold in June 2005. "The PW1 owners manipulated the Grove Project so as to allow Grove to keep between $1.3 and

$1.9 million in value" by causing PW1 to undercharge Grove for PW1's services.

In September 2005, plaintiffs obtained an arbitration award, which was confirmed as a $1,799,830 judgment against PW1 in October 2005. At the suggestion of their arbitration counsel, plaintiffs retained the law firm of Rutan and Tucker (Rutan) to pursue collection efforts.

## II. Collection Efforts During 2006–2007

Rutan garnered substantial discovery about PW1 and PW2 despite "fierce[] resist[ance]" from the PW Owners. Information collected by Rutan included research into a PW1 website that hosted PW-related entities, which "revealed projects that had been started by PW1 but which had been taken over by PW2." Rutan also conducted an Order of Examination (OEX) for two PW Owners, Edwin Law and Gavin Lam. Lam's August 2006 OEX contained testimony establishing that "the reason PW2 was formed and the assets and business of PW1 were transferred to it was to avoid the legal claims against PW1." Seventy-six boxes of records were produced during Lam's OEX, which included tax returns and financial statements.

At Law's July 2006 OEX, PW1 resisted a discovery request for computer records, claiming that its computer systems were all sold to PW2, a nonparty to the arbitration action. To justify this position, PW1 produced a bill of sale dated August 3, 2005, two weeks before plaintiffs obtained their arbitration award. Rutan's computer expert determined that the bill of sale was created in October 2005.

In December 2006, Rutan filed a collection action on behalf of plaintiffs, asserting alter ego and direct tort liability theories against PW2 and the PW Owners. Then Rutan obtained a writ of attachment that "tied up" $500,000 of PW2 assets, and a court order requiring PW2 to produce missing

3

accounting documents, electronically stored information and computer records. In response, the PW Owners promptly filed for Chapter 11 bankruptcy on behalf of PW2, securing a stay of state court discovery. As debtors in possession of PW2, the PW Owners enriched themselves through transfers of PW2 assets. In November 2007, PW2's bankruptcy was converted to a Chapter 7 proceeding.

## III. Defendants' Representation of Plaintiffs

In October 2007, plaintiffs retained Ken Greene to replace Rutan as counsel in their collection action. Prior to his retention, Greene had been advising Seth Samuels for several months, and he convinced Samuels that Rutan "had made mistakes and overcharged him." Greene's attorney fee agreement provided that he would be paid $200 per hour to continue prosecution of the collection action, participate in the PW2 bankruptcy action, and take any other action agreed upon by the parties. The agreement did not contain a provision relieving Greene of his obligation to provide attorney services in the event plaintiffs' resources were depleted or they failed to pay their bills. In around November 2007, Greene became a partner at Hamrick & Evans, bringing plaintiffs' cases with him.[1]

In January 2008, the PW Owners filed motions for summary judgment or summary adjudication in plaintiffs' collection action. Greene obtained multiple continuances, which delayed the hearing on these motions until December and the July 2008 trial date until summer 2009.

During 2008, Greene did not take any discovery relating to the pending summary judgment motions; he did not take depositions despite plaintiffs'

---

[1] Defendants represented plaintiffs in two other actions arising out of the Noriega Street project, one against Everest Insurance Company and the other against companies responsible for defective windows. Disputes about defendants' representation in those cases are not before us on appeal.

4

requests that he do so; and, although he attempted to subpoena business records from PW-related entities, all of his subpoenas were quashed due to procedural errors. When Greene obtained a final continuance of the trial date, he failed to request that discovery remain open, causing additional subpoenas to be quashed as well. As a consequence of Greene's failure to subpoena relevant records, his chosen expert, Colin Johns, declined to testify.

Greene failed to properly secure, prepare or disclose an expert witness to offer opinions opposing the summary judgment motions. He told plaintiffs he thought Colin Johns would "make a poor showing" and did not want to use him, and he also rejected Everett Harry, another expert who Seth Samuels had found. In October 2008, Samuels contacted Claudia Berglund who is a forensic accountant. Greene retained Berglund and had plaintiffs pay her $10,000. Berglund made preliminary conclusions supportive of plaintiffs' alter ego and fraudulent transfer claims, but when Greene attempted to amend his expert witness disclosure two days before the second session of the summary judgment hearing, the PW Owners objected, and Greene stopped working with Berglund. Ultimately, Greene filed a declaration by Seth Samuels, but he failed to advise the court about Samuels's "extensive training in accounting, and significant experience with computerized accounting systems." Samuels's declaration was deemed inadmissible on the ground that Samuels was not qualified as an expert.

In opposing the summary judgment motions, Greene did not utilize evidence that had been garnered by plaintiffs before they retained Greene. That evidence would have established the PW Owners' control of PW-related entities and that they made fraudulent transfers. Plaintiffs also had persuasive evidence showing that the PW Owners "took unabashed and repeated steps to conceal and then destroy . . . evidence from their PW

5

Computer Server Network." Although it took plaintiffs years fully to unravel the PW Owners' trail of wrongdoing, sufficient evidence to have defeated the motion for summary adjudication was readily available to Greene when he took over the case.

In January 2009 the PW Owners were granted summary adjudication as to most of plaintiffs' causes of action, including the alter ego claims. In February, Greene took the depositions of three PW Owners. Subsequently, he filed a motion for reconsideration of the summary adjudication order, relying on the 2009 depositions, business records from PW1, and the declaration of a computer expert. That motion was denied as untimely.

Despite the unfavorable summary adjudication rulings, evidence available to Greene could have been used to prove fraudulent transfer claims that had not been summarily adjudicated. Instead of pursuing that course, Greene began advising plaintiffs to dismiss their case. About six weeks before the rescheduled trial date, Greene threatened to withdraw from the case, claiming his future bills could be as high as $150,000.

In July and August 2009, Greene represented plaintiffs in proceedings on their motion to establish that PW1 and the PW Owners committed spoilation of evidence. Plaintiffs relied on evidence that when PW2 finally complied with court orders compelling production of the computers that PW1 allegedly sold to PW2, the hard drives had all been "wiped." The trial court found that "massive destruction of documents" had occurred, but plaintiffs failed to prove their spoilation claim because they did not establish that the destroyed documents contained discoverable information that plaintiffs had not previously received in another format.

On August 10, 2009, plaintiffs' collection action was dismissed without prejudice.

In June 2012, defendants represented plaintiffs at a hearing regarding plaintiffs' proof of claim in the PW2 bankruptcy case. Plaintiffs sought to recover the PW1 judgment pursuant to theories of successor liability, alter ego, and fraudulent transfer of assets. The bankruptcy court overruled objections to plaintiffs' claim, finding that PW2 is the alter ego and successor to PW1. Plaintiffs' allowed claims against PW2 totaled $2,189,890. However, the amount paid for these unsecured claims was only $222,771.

## IV. Findings and Judgment in the Malpractice Action

In October 2013, plaintiffs filed this malpractice action. A court trial was held over fourteen nonconsecutive days between September and November 2018, after which the court elicited post-trial submissions. A May 2019 final proposed statement of decision was adopted as the court's final statement of decision on June 5, 2019.

The first set of legal issues decided by the trial court pertained to whether defendants breached their duty of care to plaintiffs. The court found that resolution of this issue turned on the expert testimony. (Citing CACI 600.) Plaintiffs' expert, an attorney named William Norman, testified that Greene's conduct fell far below the standard of care in several ways, including: failing to take adequate steps to oppose the summary adjudication motions; failing to take the remaining fraudulent transfer claims to trial; and forcing plaintiffs to dismiss their collection action by threatening to withdraw as their counsel.

Defendants did not elicit opinions from their designated experts as to whether Greene breached the standard of care, relying instead solely on Greene's testimony. Greene claimed that the reason he did not do more work in the collection action was because plaintiffs lacked adequate financial resources to pay for it. The court rejected this testimony on two independent

grounds. First, the trial evidence established that "money was not the issue." Throughout 2008, plaintiffs paid all bills relating to the collection action; they paid Greene's fees, Berglund's expert fee at Greene's direction, and they also paid for discovery that Greene finally conducted in 2009. Second, and in any event, Greene's alleged concern about money was no excuse for committing "an extremely serious breach of the standard of care." Ultimately, the court found that Norman's "credible and believable" expert testimony established that defendants' conduct fell substantially below the standard of care and, to the extent Greene's testimony could be construed as contradicting any of Norman's opinions, it was "not credible or believable."

The other set of issues decided by the court pertains to whether defendants' breach of duty caused plaintiffs' damages. Plaintiffs employed the "trial-within-a-trial" method to show that they would have prevailed on their alter ego claims against the PW Owners if not for Greene's malpractice. This theory required that plaintiffs establish " 'collectibility,' " i.e., that they were deprived of the opportunity to collect a money judgment from a solvent debtor. (*Wise v. DLA Piper LLP* (2013) 220 Cal.App.4th 1180, 1190 (*Wise*).)

The parties presented conflicting expert testimony as to whether plaintiffs would have prevailed on their alter ego claims against the PW Owners. William Norman testified that plaintiffs would have prevailed on these claims because they had strong evidence to establish both unity of interests and inequitable conduct. Defendants' expert, Heather Xitco, is a forensic accountant who opined that the available financial records would not have supported a conclusion that the PW Owners had an alter ego relationship with PW1.

The trial court concluded that Norman's opinions on these matters were credible and reasonable and rejected Xitco's opinions as neither credible

8

nor believable.  Findings in support of these rulings included that Norman's qualifications are superior to Xitco's qualifications:  Norman is an attorney with more than 40 years of experience litigating complex commercial cases, of which 75 involved alter-ego issues; Xitco is an accountant who focused exclusively on financial matters.  Further, Norman's opinions are supported by a comprehensive analysis of the relevant chronological facts, while Xitco based her opinion on the sole fact that complete financial records were not available, ignoring other pertinent facts and events that occurred before and after plaintiffs obtained the 2005 judgment.

The court also independently reviewed the evidence admitted as part of the trial within a trial and concluded that plaintiffs should have prevailed on their alter ego claims.  In reaching this conclusion, the court made an express finding that "[t]here was a unity of interest between and ownership between [the PW Owners] and the corporation PW1 which enabled them to take PW1 assets and transfer them either to themselves or other entities as to which they were owners which resulted in a serious inequity of PW1 being unable to pay a judgment for 1.8 million."  The court also found that if not for Greene's malpractice, a judgment in the underlying case should have been obtained in mid-2008.

Next, the court found that plaintiffs carried their burden of proving that the judgment they should have obtained in mid-2008 would have been collectible.  Mr. Norman, the only expert who testified as to this issue, offered the opinion that a judgment against the PW Owners would have been collectible.  The court found that Norman was "extremely well qualified to express an opinion on collectability" and that his "factual testimony" about this matter was "extremely strong and credible because of his background, experience and knowledge of specific facts in this case."  For example, he

9

testified about the PW Owners' interests in other PW-related projects, including a 50,000-square foot office condominium building in Santa Clara known as the Pearl Gateway Project, valued at over $15 million, and another project referred to as the "Jiagmen China project," which had been built without a construction loan and was worth between $10 and $15 million. Norman also based his opinion on the work-product of Berglund, plaintiffs' expert in the collection action, which showed that PW1 had a substantial interest in the Grove project because it had improperly transferred $1.9 million to that project.

The court also "performed its own analysis" and found "as a fact" that the $1.8 million judgment was collectible. The court supported this finding with three additional categories of evidence. First, financial statements produced at trial showed that two of the PW Owners, Au and Lee, "collectively had a net worth of $4,621,559 and collectively [had] cash and stocks and bonds and real property excluding their homes, of $2,260,959." The court found that Greene could have taken steps to ensure that the October 2005 judgment was collectible from the PW Owners by attaching these funds in 2007, after he took over the case.

Second, the PW owners' conduct during the PW2 bankruptcy proceedings was additional evidence of their solvency. In 2009, the bankruptcy trustee filed a motion for sanctions against the PW Owners for, among other things, intentionally destroying PW1 business records in order to cover up transfers of assets from PW1 to PW2, and for causing improper pre-petition and post-petition payments from the PW2 bankruptcy estate. In 2010, the PW Owners elected not to defend the trustee's "well-prepared motion," and paid $660,000 to settle the trustee's claims against them. The fact that these individuals had resources to pay the settlement was

"persuasive evidence" that they could have paid a judgment in plaintiffs' collection action if defendants had met their standard of care and brought the case to trial on the original trial date in mid-2008. Moreover, the court found, if the alter ego claims had been proven in plaintiffs' case, bankruptcy estate assets would not have been depleted litigating these same issues, and there would have been more funds available to pay plaintiffs as creditors of PW2. In this regard, the court observed that $500,000 of the sanctions settlement was paid to the trustee and his attorney for their work on the motion.

Third, the court found, evidence that the PW1 owners deliberately destroyed documents and records in order to conceal their transfers of assets from PW1 to PW2 supported a finding that the PW Owners "at all times had effective ownership of assets of sufficient value that the judgment in the case-within-the-case would have been collectable."

## V. Calculation of Damages and Entry of Judgment

The court found that because defendants' malpractice was the cause of plaintiffs' failure to collect the October 2005 judgment in 2008, plaintiffs' damages are equal to the amount of that judgment plus interest at the legal rate. In calculating the unpaid balance of the 2005 judgment, the court gave defendants credit for two partial payments: $28,284, which had been "collected directly" from the PW Owners/entities; and $222,867, which plaintiffs received from the PW2 bankruptcy trustee. The court also adjusted its calculation of accrued interest on the 2005 judgment to reflect the fact that the judgment was renewed in February 2015. Applying these criteria, the court determined that, as of February 20, 2019, damages caused by defendants' negligent failure to collect the 2005 judgment totaled $4,502,807.

Judgment was entered on June 5, 2019. The court ordered that judgment be rendered in favor of plaintiffs and against defendants in the

11

amount of $4,502,807 plus interest, for a total amount of $4,596,857 as of the date of entry of judgment.

## DISCUSSION

## I. The Collectibility Findings Were Not Error

Defendants contend the judgment against them must be reversed because there is insufficient evidence that they caused plaintiffs damage. Defendants concede that plaintiffs would have obtained a judgment in 2008 in their collection action against the PW Owners (i.e., a hypothetical 2008 judgment) if not for defendants' malpractice. But they contend there is no substantial evidence such a judgment was collectible. (See *Garretson v. Harold I. Miller* (2002) 99 Cal.App.4th 563, 569 (*Garretson*) [trier of fact's collectibility findings are reviewed for substantial evidence]; *Wise, supra*, 220 Cal.App.4th at p. 1191 [same].)

### A. Legal Principles

" 'In civil malpractice cases, the elements of a cause of action for professional negligence are: "(1) the duty of the attorney to use such skill, prudence and diligence as members of the profession commonly possess; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage." ' " (*Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336, 356–357 (*Blanks*).)

The causation and damages elements of malpractice require the plaintiff to establish that "but for the defendant's negligent acts or omissions, 'the plaintiff would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred.' " (*Blanks, supra*, 171 Cal.App.4th at p. 357.) To satisfy these requirements in the present case, plaintiffs employed the trial-within-a-trial method, which requires the current trier of fact to " ' "determine what a reasonable judge or fact finder

12

would have done. . . ." [Citation.]  Even though "should" and "would" are used interchangeably by the courts, the standard remains an objective one. The trier of fact determines what should have been, not what the result would have been, or could have been, or might have been, had the matter been before a particular judge or jury.' " (*Ibid.*, italics omitted.)

As part of its trial-within-a-trial case, the plaintiff must "prove that careful management" of the underlying case "would have resulted in a favorable judgment and collection thereof, as there is no damage in the absence of these latter elements." (*DiPalma v. Seldman* (1994) 27 Cal.App.4th 1499, 1506–1507.)  "In this sense, collectibility of the hypothetical underlying judgment . . . is a component of the plaintiff's current case relating to damages, as caused by the current negligent attorney defendant." (*Wise*, *supra*, 220 Cal.App.4th at p. 1191.)

Proving collectibility invariably requires " 'a showing of the debtor's solvency.' " (*Wise*, *supra*, 220 Cal.App.4th at p. 1190.)  " 'The loss of a collectible judgment "by definition means the lost opportunity to collect a money judgment from a solvent [defendant] and is certainly legally sufficient evidence of actual damage." ' " (*Ibid*.)  The inquiry is not just a question of technical solvency, as it focuses more broadly on evidence of the defendant's "ability to pay a judgment or some part of it." (*Hecht, Solberg, Robinson, Goldberg & Bagley LLP v. Superior Court* (2006) 137 Cal.App.4th 579, 591 (*Hecht*).)

Collectibility is a fact-intensive inquiry, which " ' "looks to the actual circumstances to determine whether the judgment 'would have been collectable.' " [Citation.]  It is not enough for a plaintiff to present speculation or assumptions about an underlying defendant's ability to respond in damages, as opposed to proof of same.' " (*Wise*, *supra*, 220

13

Cal.App.4th at p. 1191.)  On the other hand, absolute certainty is not required.  (*Ibid.*)  "Admissible evidence on collectibility can include information about the basic solvency of the defendant in the underlying case, as shown by its assets, net worth or available proceeds from investments." (*Hecht*, *supra*, 137 Cal.App.4th at p. 591.)

### B.  Analysis

In concluding that a hypothetical 2008 judgment against the PW Owners would have been collectible, the trial court referenced four categories of evidence:  Norman's expert opinion; personal financial statements of two of the PW Owners; the PW Owners' conduct in the bankruptcy case; and evidence that the PW Owners deliberately concealed their assets from plaintiffs and the courts.  Defendants contend that each category of evidence is either inadmissible or insufficient to establish collectibility.  We address defendants' arguments with the caveat that the issue on appeal is whether all the evidence considered together substantially supports the judgment.

### 1.  Expert Evidence

During Norman's direct testimony, plaintiffs' counsel asked for Norman's expert opinion as to whether the PW Owners "actually had assets that could have been collected" if not for defendants' breach of their standard of care.  Norman responded that a $2 million judgment divided among the four individuals "was clearly collectible at the time."  Norman also opined that, although a judgment would not have been collectible from PW1 in 2008, that entity would also have had sufficient money to pay plaintiffs' judgment if it had been "honestly run," and the PW Owners had not transferred the company assets.

Defendants attempt in various ways to discredit Norman's opinions. For example, they contend erroneously that Norman did not "even opine on

14

collectibility," ignoring the testimony summarized here. They also argue that the court did not qualify Norman to offer an opinion on the issue of collectibility. Again, the record shows otherwise. During voir dire, Norman testified that his 40 years' experience practicing law includes handling malpractice cases as well as alter ego and fraudulent transfer cases and he has been qualified as an expert on the subject of attorney conduct "on a number of occasions." After defendants declined to voir dire, the court found that Norman was qualified without limiting its finding to a specific issue. More importantly, the court soon followed this by asking whether Norman's testimony as an expert on "malpractice" would include the following opinions: (1) defendants violated the standard of care in presenting the underlying case; (2) if defendants had acted within the standard of care, the underlying case would have been proved; *and* (3) plaintiffs would have collected money if not for the defendants' breach of duty. Norman confirmed he would offer these opinions without drawing any objection from the defendants. "[T]he qualification of a witness to state his or her opinion is waived by failure to object to the testimony when offered." (*569 E. County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 437, fn. 12.)

Defendants' substantive objection to Norman's opinion is that he allegedly relied on speculative factors and assumptions not supported by the record. The testimony of a single witness, including an expert witness, may constitute substantial evidence, but "when an expert bases his or her conclusion on factors that are 'speculative, remote or conjectural,' or on 'assumptions . . . not supported by the record,' the expert's opinion 'cannot rise to the dignity of substantial evidence' and a judgment based solely on that opinion 'must be reversed for lack of substantial evidence.' " (*Wise*, *supra*, 220 Cal.App.4th at pp. 1191–1192.)

15

*Wise* provides a useful example of an expert opinion unsupported by the evidence.  (*Wise*, *supra*, 220 Cal.App.4th 1180.)  The plaintiffs obtained a malpractice judgment against their former attorneys who helped them secure a money judgment against Mr. Cheng for defaulting on a loan but then failed to advise them of the necessity to renew the judgment.  (*Id.* at p. 1183.)  The malpractice judgment was reversed on appeal, however, because there was "no evidence" the Cheng judgment would have been collectible even if it had been renewed.  (*Ibid.*)

The *Wise* plaintiffs' trial expert, a collections attorney, testified that the Cheng judgment was collectible in the past and would be collectible in the future.  (*Wise*, *supra*, 220 Cal.App.4th at p. 1192.)  This testimony did not constitute substantial evidence of collectibility because it was premised on "an incorrect legal theory" that plaintiffs could have employed "reverse piercing" to reach funds that third party investors had paid to corporate entities operated by Cheng.  (*Id.* at p. 1193.)  Although the expert gave additional reasons for his collectibility opinions, none carried evidentiary weight.  (*Id.* at p. 1194.)  For example, the expert speculated that Cheng owned part of his home but the trial evidence showed that he did not.  The expert also suspected that Cheng had money hidden in foreign bank accounts and assumed that he "had significant financial resources" because he had taken multiple trips to China, but there was no evidence to support these assumptions.  Because the expert's collectibility opinion "relied purely on speculation or assumptions unsupported by the record," a judgment based solely on that opinion was reversed for lack of substantial evidence.  (*Ibid.*)

In contrast to *Wise*, Norman's expert opinions do not depend on any invalid legal theory; there is no dispute on appeal that the PW Owners are alter egos of the PW-related entities and that they fraudulently transferred

16

assets out of PW1 in order to avoid having to pay the 2005 judgment. Nor do defendants establish that Norman's opinions are predicated on speculation or unproven assumptions. Norman demonstrated to the trier of fact that he has extensive knowledge of the historical facts and provided concrete examples supportive of his conclusion that the 2005 judgment was collectible from the PW Owners in 2008. In this regard, Norman testified that the 2009 depositions of the PW Owners, which could have been taken in 2008 if Greene had been diligent, showed that the "individuals owned substantial shares in a number of real estate projects" including the Jiagmen China project and the Pearl Gateway project. Norman also based his opinion on the trial-within-a-trial testimony of Berglund and Harry, which established that the PW Owners transferred somewhere between $1.5 and $1.9 million from PW1 to other PW-related entities "owned by the four men."

Defendants contend that Norman's opinion is speculative because there is no evidence in the trial record that the PW Owners' interests in either Jiagmen China or Pearl Gateway had sufficient value to enable them to pay a $1.8 million judgment in 2008. First, we reject the suggestion that Norman was required to proffer documentation of facts relied on to support his opinion, particularly when defendants did not challenge that opinion at trial. Second, Norman did not opine that a judgment would have been collectible directly from these two sources but used the projects as examples of interests that the PW Owners held in other PW-related entities and projects. The trial record contains undisputed evidence of the PW Owners' personal ownership interests in multiple PW-related companies and in the real estate assets of those companies. This evidence provides record support for Norman's expert opinion that the PW Owners were not only solvent but had the ability to pay a $1.8 million judgment.

17

Insisting that Norman's opinion is not supported by the trial evidence, defendants contend that "[s]imply showing that a defendant had many assets, or a high income, is not sufficient evidence of collectibility." For this proposition, defendants cite *Garretson, supra*, 99 Cal.App.4th 563. In that case, the plaintiff was injured when she turned on an air compressor at the dental office where she worked and experienced a shock. Her first attorney pursued a workers' compensation claim but never advised her she had a potential personal injury claim against third parties responsible for the incident. (*Id.* at pp. 565–566.) After plaintiff hired a new attorney, she sued her former lawyer for malpractice.

At the *Garretson* plaintiff's trial within a trial, her theory was that her injury was caused by a defective switch installed by an electric company, under the supervision of a contractor and of Dr. Ask, who owned the dental practice where the incident occurred. (*Garretson*, *supra*, 99 Cal.App.4th at p. 567.) Plaintiff used evidence supportive of this theory to argue that the defendant committed malpractice by failing to recognize and preserve her personal injury claim against these third parties. The jury agreed, but the trial court granted the defendant judgment notwithstanding the verdict (JNOV). Affirming the judgment on appeal, the *Garretson* court held that "the issue of collectibility was not tried. No evidence was presented by plaintiff to establish collectibility of any judgment that might have been obtained but for defendant's negligence, and no argument was made to the jury on the subject. This failure of proof on the part of plaintiff warranted entry of [JNOV]." (*Id.* at p. 573.)

The *Garretson* court rejected the plaintiff's appellate argument that the JNOV was not warranted because the jury at her trial within a trial could have concluded that a personal injury judgment against Dr. Ask was

collectible even though the issue was not expressly addressed. (*Garreston*, *supra*, 99 Cal.App.4th at p. 572.) Plaintiff theorized that evidence Dr. Ask had a successful dental practice would support a finding that he was " 'a significant income earner,' " and the fact that he owned his office building was additional evidence of collectibility. (*Ibid*.) The court rejected these arguments because the plaintiff produced no evidence of the doctor's income, expenses, debts or insurance assets, and it was not possible to determine from the record whether the doctor "had any positive net income, net worth, or other means of satisfying the judgment." (*Ibid*.)

In the present case, defendants maintain that this case presents "precisely the situation" as *Garretson*. Not true. Since the *Garretson* plaintiff did not offer any evidence to establish collectibility, that case obviously does not address what evidence an expert may consider in forming an opinion about the matter. Nor does *Garretson* support defendants' notion that evidence a debtor has "many assets, or a high income" can never be sufficient to support a finding by the trier of fact that a judgment would have been collectible. The core problem in *Garretson* is that the collectibility issue was never litigated. By contrast here, plaintiffs offered evidence including expert evidence to prove collectibility and, although defendants elected to ignore the issue, the trial court made an express finding that a hypothetical judgment against the PW Owners would have been collectible. Nothing in *Garretson* precludes us from concluding that Norman's expert opinion constitutes substantial evidence supporting the collectibility finding.

### 2. Personal Financial Statements

As noted, the trial court did not just rely on Norman's expert opinion but conducted an independent review that disclosed additional evidence of collectibility. For example, the court found two of the four individual PW

19

Owners had sufficient net worth and attachable assets to pay between them the $1.8 judgment. This finding is supported by the June 30, 2006 personal financial statements of Eric Au and Lawrence Lee. As of that date, Au reported a net worth of $3,415,400, Lee reported a net worth of $1,807,159, and both individuals reported having no current liabilities. These statements also show the PW Owners owned attachable assets (i.e., not their homes) that had a collective value of more than $2,200,000.

Defendants contend the personal financial statements are not substantial evidence of collectibility for three distinct reasons. First, defendants posit that this evidence is inadmissible hearsay. The record shows that the financial statements were identified and subsequently offered into evidence during Seth Samuels's trial testimony. Samuels testified that this evidence was produced during discovery in the plaintiffs' collection action against the PW Owners. It was found in a locked QuickBooks file after plaintiffs obtained the password from the PW2 bankruptcy trustee in April 2008. After Samuels described printing copies of these statements, the trial court overruled defendants' hearsay objection and admitted them into evidence.

On appeal, defendants renew their hearsay objection, contending erroneously that neither the plaintiffs nor the court "identified any hearsay exception." The statement of decision contains an entire subsection addressing this issue. There the court explains that evidence offered as part of the trial within a trial must be analyzed differently than evidence offered to establish a breach of the standard of care because in the trial within a trial, the PW Owners are considered the defendants. Therefore, the court found, statements by PW Owners are admissible pursuant to the party admission exception to the hearsay rule. (Citing *Kessler v. Gray* (1978) 77

20

Cal.App.3d 284, 290–291; *Mattson v. Schultz* (7th Cir. 1998) 145 F.3d 937, 940; see also Evid. Code, § 1220.) Failing to acknowledge this express ruling by the trial court, defendants forfeit any claim it was error.

Defendants' second contention is that the PW Owners' personal financial statements cannot be substantial evidence of collectibility because there was a two-year " 'gap' " period between these statements and the time when plaintiffs should have collected their judgment, and plaintiffs failed to prove that the financial condition of these individuals did not change during that period. As authority for imposing this burden on plaintiffs, defendants cite *Akin, Gump, Strauss, Hauer & Feld v. NDR* (Tex. 2009) 299 S.W.3d 106 (*Akin*). (See also *Webb v. Stockford* (Tex.App. 2011) 331 S.W.3d 169, 178 (*Webb*) [applying *Akin*].)

*Akin* was a malpractice action against the Akin Gump law firm for failing competently to represent the plaintiff in litigation arising out of plaintiff's contract dispute with Panda Energy International Corporation and several of its subsidiaries (Panda), which resulted in a series of judgments in favor of the Panda entities. (*Akin, supra*, 299 S.W.3d at pp. 106, 109.) In the malpractice case, a jury found in favor of plaintiff, awarding damages that included attorney fees plaintiff had paid in the Panda litigation as well as a hypothetical judgment that plaintiff should have recovered from Panda International and/or its subsidiary Panda Global. (*Id.* at p. 106.) The Texas Supreme Court found that attorney fees were recoverable as damages but there was insufficient evidence that a judgment against Panda would have been collectible. (*Ibid.*)

The collectibility issue addressed in *Akin* was limited to the question whether a judgment would have been collectible against the parent corporation Panda International because there was no dispute on appeal that

21

subsidiary Panda Global was insolvent and no judgment could be collected from it. (*Akin, supra,* 299 S.W.3d at p. 111.) The *Akin* court concluded the trial evidence did not establish that Panda International could have accessed sufficient funds to pay a judgment at the time the underlying case was decided. (*Id.* at pp. 111 & 115.) In reaching this conclusion, the court articulated the principle that when a plaintiff relies on evidence of collectibility on a date prior to the final judgment in the underlying case, the evidence must also show "a reasonable probability that the . . . defendant's financial condition did not change during the time before a judgment was signed in a manner that would have adversely affected collectibility." (*Id.* at p. 114.) Without evidence covering this "gap time period," the court explained, the factfinder would have to speculate about how intervening events affected the judgment debtor's finances. (*Ibid.*)

Here, defendants argue that *Akin* compels the conclusion that the trial court's collectibility finding is speculative because the PW Owners' 2006 personal financial statements predate by two years the judgment that plaintiffs should have obtained against them, and there is no evidence that the financial condition of these individuals did not deteriorate during the two-year gap period. Defendants cite no California authority approving or applying the gap period requirement discussed in *Akin*, and we need not decide whether such a requirement might sometimes be appropriate in light of the material distinctions between *Akin* and this case. Dispositive for the Texas court was that the *Akin* plaintiff relied primarily on evidence that nonparty Panda entities had assets to pay the judgment but failed to establish that those resources were accessible by Panda International. Here there is no dispute that the PW Owners are the alter egos of PW1 and PW2 and that they fraudulently transferred assets between these and other PW-

related entities in order to avoid paying plaintiffs damages arising from the defective construction of the Noriega project. Further, in contrast to *Akin*, the plaintiffs in this case proffered expert evidence of collectibility, which by itself substantially supports the trial court's finding. And in *Akin*, there was evidence of the "financial deterioration of the Panda entities and projects" during the gap time (*Akin, supra,* 299 S.W.3d at p. 117), evidence that finds no parallel in the record in this case. In light of these differences, we do not find *Akin* persuasive authority here.

Defendants' final complaint about the PW Owners' personal financial statements is that the trial court erred by speculating that Greene could have successfully attached the personal assets of the PW Owners in 2007. The trial court did not speculate about this matter, but made express findings that Greene could and should have moved to attach personal assets of the PW Owners no later than November 2007. The court based these findings on evidence that the reason plaintiffs were denied a writ of attachment against the PW Owners in December 2006 was because at that time they did not have the evidence to establish the PW Owners were individually culpable for the 2005 judgment, but by the time Greene took over the case in October 2007, plaintiffs had collected additional evidence that could have been used to obtain a writ of attachment against the property of the PW Owners. Personal financial statements were part of that evidence, although the court gave many other examples, including an expert declaration outlining the PW Owners' falsification of evidence, QuickBooks files of PW1 and PW2, and other documentary proof of fraudulent transfers instigated by the PW Owners. Defendants offer no response to these findings.

### 3. Bankruptcy-Related Payments

The trial court found that a 2009 sanctions motion that the PW2 bankruptcy trustee filed against the PW Owners is probative evidence of collectibility in two ways: (1) the "well-prepared" motion depleted bankruptcy estate resources that would otherwise have been available to pay creditor claims, including plaintiffs' approved claim for the October 2005 judgment; and (2) the fact that the PW Owners paid $660,000 to settle the motion in 2010, was evidence they had resources to pay a judgment in 2008.

Defendants dispute these findings on the ground that there is no evidence the PW Owners actually paid the $660,000 settlement with their own funds, suggesting the money could have been borrowed or gifted to them. We are not persuaded by defendants' speculation; the fact that the settlement was paid in 2010 is circumstantial evidence that the PW Owners were solvent and had the ability to pay a 2008 money judgment. Evidence pertaining to the sanctions motion is also relevant to show another way that defendants' malpractice caused plaintiffs' damages. If Greene had competently opposed the summary adjudication motions and secured a judgment against the PW Owners in 2008, the funds used by the bankruptcy trustee to prove the fraudulent transfers and alter ego claims would have been available to pay a larger portion of the October 2005 judgment, thus reducing the unpaid balance and increasing the likelihood of collectibility from the individual PW Owners.

### 4. Deliberate Destruction of Asset Evidence

Defendants do not dispute that the PW Owners destroyed documents in order to conceal asset transfers from PW1 to themselves and their other companies. However, they contend that the trial court erred by relying on this evidence to support its collectibility finding. Specifically, defendants

argue that because the evidence showing what assets were transferred was actually destroyed, it would be "utter speculation" to conclude that the transferred assets were of sufficient value to pay the judgment in mid-2008.

Defendants' logic does not withstand scrutiny. The trial court did not find that the judgment was collectible from any specific asset that was transferred out of PW1; it found that the PW Owners' deliberate destruction of evidence documenting these transfers was relevant evidence of collectibility. We agree. The fact that the PW Owners were actively hiding their assets is relevant to prove they had funds to pay the 2005 judgment both before and after defendants should have secured a judgment against them in 2008. To analogize, no reasonable homeowner would secure worthless baubles in a safe.

Importantly, the issue on appeal is whether all the evidence considered together substantially supports the finding that a judgment against the PW Owners would have been collectible, not whether any specific item of evidence is sufficient by itself to support this finding. Here, we affirm the trial court's collectability finding because Norman's expert testimony, along with other evidence discussed by the trial court, constitutes substantial evidence that a hypothetical judgment against the PW Owners would have been collectible. As best we can tell, defendants made a strategic decision to ignore the issue of collectibility at trial. They did not object to Norman's expert opinion or cross-examine him about it. Nor, apparently, did they elicit testimony or offer evidence suggesting that the PW Owners were personally insolvent or that their personal financial situations deteriorated at any relevant time. Although plaintiffs had the burden to prove collectibility at trial, on appeal all doubts are resolved in favor of the judgment. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.)

25

## II. The Court Did Not Err By Awarding Interest Damages

Defendants contend that even if a judgment against the PW Owners would have been collectible, the trial court erred by finding that plaintiffs' malpractice damages include interest that accrued on the 2005 judgment up until entry of judgment in this case. Defendants argue that plaintiffs may not recover any interest that accrued on the 2005 judgment after mid-2008, when Greene failed to obtain a judgment against the PW Owners in the collection case.

The 2005 judgment is the core component of plaintiffs' malpractice damages because they proved at their trial within a trial that they would likely have collected that judgment from the PW Owners in or after 2008 if not for defendants' malpractice. "Interest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied." (Civ. Proc. Code, § 685.010.) And, since interest on the unpaid balance of the 2005 judgment at a rate of 10 percent would have been recoverable in the collection action, postjudgment interest on the 2005 judgment is part of the damages caused by defendants' malpractice. Thus, defendants concede that interest on the 2005 judgment accrued at a rate of 10 percent per annum at least until mid-2008 when the hypothetical judgment should have been secured against the PW Owners.

The issue on appeal is whether plaintiffs incurred additional recoverable damages during the period from mid-2008 until entry of the malpractice judgment in 2019. Defendants contend that postjudgment interest on the 2005 judgment was capped as of the date of the hypothetical judgment because the "ever-increasing value" of that judgment after mid-2008 is not attributable to the defendants' malpractice. Plaintiffs counter that defendants' malpractice and the damage caused thereby did not stop in

26

mid-2008. They take the view that since the 2005 judgment was never satisfied, interest that continued to accrue after 2008 is also part of their recoverable damages.

To start, we reject defendants' premise that their malpractice did not cause plaintiffs any damages after entry of a hypothetical judgment against the PW Owners in or around mid-2008. Findings by the trier of fact show that defendants' inadequate representation continued beyond that date, causing the abandonment of viable fraudulent transfer claims in 2009, and contributing to the diminishment of plaintiffs' unsecured bankruptcy claim against PW2. For these reasons, the defendants' motion for a new trial due to excessive damages was denied. In its order denying that motion, the court found that plaintiffs' malpractice damages include interest on the 2005 judgment until entry of the malpractice judgment in June 2019. We affirm the finding that interest accruing on the 2005 judgment constitutes damages, although we conclude that only part of the award can be justified as postjudgment interest.

Under the trial-within-a-trial mechanism that was used to prove causation and damages in this malpractice case, the 2005 judgment would have been collected and satisfied in 2008 and, at that point, postjudgment interest would cease to accrue. Pertinent provisions of the Code of Civil Procedure establish that when a money judgment is satisfied in full, postjudgment interest ceases to accrue. (Civ. Proc. Code, §§ 685.010–685.030; see *Bell v. Farmers Ins. Exchange* (2006) 137 Cal.App.4th 835, 839–840.) These statutes reflect the "underlying reasons for awarding postjudgment interest," which are to " 'compensate[] the judgment creditor for the loss of use of the money until the judgment is paid and [to act] as an incentive for the judgment debtor to pay the judgment promptly.' " (*Felczer v. Apple Inc.*

27

(2021) 63 Cal.App.5th 406, 418; see also *Bruning v. United States* (1964) 376 U.S. 358, 360.) By a parity of reasoning, defendants contend that the date of the hypothetical judgment against the PW Owners effectively capped the accrual of postjudgment interest for purposes of calculating damages caused by the failure to obtain a judgment against the PW Owners. Defendants' reasoning is sound as far as it goes.

But defendants ignore the fact that the 2005 judgment was not actually satisfied in 2008 precisely because of their malpractice. To the extent that the vehicle of a hypothetical 2008 judgment limits the accrual of postjudgment interest on the 2005 judgment, it also fixes the date upon which plaintiffs had a vested claim against these malpractice defendants. Civil Code section 3287, subdivision (a) states: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt." Thus, when postjudgment interest on the 2005 judgment ceased to accrue, prejudgment interest on the 2019 malpractice judgment began to accrue. (Civ. Code, § 3287, subd. (a).)

Anticipating our conclusion, defendants contend that plaintiffs are not entitled to any prejudgment interest under the circumstances presented here. These arguments are not persuasive. Defendants contend first that plaintiffs forfeited their right to prejudgment interest, citing *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 830–831. That case stands for the proposition that a party cannot claim prejudgment interest for the first time in a cost bill filed after entry of judgment. The rule does not apply here, where plaintiffs sought prejudgment interest in their complaint and were

28

awarded interest on the 2005 judgment in a statement of decision that was reviewed by both parties prior to its adoption. (See *Segura v. McBride* (1992) 5 Cal.App.4th 1028, 1041.)

Defendants also contend that Civil Code section 3287, subdivision (a) does not apply because damages were not certain or capable of being made certain until the malpractice judgment was entered in 2019. Defendants reason that because there was conflicting evidence on issues pertaining to their liability, the amount of money they owed to the plaintiffs could not have been made certain until after that liability was established.

" 'Generally, the certainty required of Civil Code section 3287, subdivision (a), is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability.' " (*Shell Oil Co. v. National Union Fire Ins. Co.* (1996) 44 Cal.App.4th 1633, 1651; see also *Hartford Accident & Indemnity Co. v. Sequoia Ins. Co.* (1989) 211 Cal.App.3d 1285, 1305–1307.) Thus, for example, damages are " 'capable of being made certain . . . where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' " (*Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1173–1174.) Moreover, even when the plaintiff proposes alternative formulas for calculating damages, all of which are disputed, prejudgment interest is recoverable so long as the amount of damages is ascertainable under each alternative theory and all that is required is a legal determination about what measure applies. (*Shell Oil Co.*, at p. 1651.)

In the present case, the primary disputed issues at trial were whether defendants breached their duty of care to plaintiffs and whether that breach caused plaintiffs damages. As discussed, collectibility is a component of

causation when the breach of duty is the failure to collect a judgment, and collectability was disputed at trial. But there has never been a dispute among these parties that the plaintiffs' loss derives from the failure to collect the 2005 judgment. The amount of that judgment and the accrual of postjudgment interest up to the date of the hypothetical 2008 judgment are ascertainable with mathematical certainty. (See *Mussetter v. Lyke* (1998) 10 F.Supp.2d 944, 965 [applying California law].) Defendants concede as much by attempting to use that formula to limit their liability for damages caused by their malpractice. Defendants nonetheless contend that damages were not certain or capable of being made certain because the measure of damages— what plaintiffs would have collected from PW1 in mid-2008—would decline if the trial court found the original judgment to be only partially collectible. But defendants point to nothing in the record that makes this argument more than theoretical—no evidence that partial collectability was argued in the trial court or supported by substantial evidence. We therefore decline to entertain it here.

In addition, or alternatively, even as to unliquidated claims for tort damages, the court sitting as trier of fact has discretion to award prejudgment interest under Civil Code section 3288. (*Bullis v. Security Pacific National Bank* (1978) 21 Cal.3d 801, 814, fn. 16.) "Prejudgment interest is awarded to compensate a party for the loss of the use of his or her property." (*Id.* at p. 815.) Interest awarded under section 3288 accrues from the time plaintiff incurs the loss. (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1588; *Piutau v. Fed. Express Corp.* (2003) 2003 U.S.Dist. Lexis 6830 *21 [applying California law].)

In sum, the trial court did not err in awarding prejudgment interest on the amount plaintiffs would have recovered in 2008, absent defendants'

malpractice.  Either because the recoverable amount was fixed as of mid-2008 or because these are tort damages, prejudgment interest is proper.  (See Civ. Code, §§ 3287, subd. (a); 3288).

## III.  Damages Must Be Recalculated

Finally and more persuasively, defendants contend that even if plaintiffs are entitled to prejudgment interest, the damages award is excessive for several reasons.  First, all interest damages were calculated at a rate of 10 percent per annum.  The statement of decision adopts the plaintiffs' calculation of damages, which is quite difficult to decipher but does appear to calculate all components of interest damages at a rate of 10 percent per annum.  Defendants contend that prejudgment interest cannot exceed 7 percent per annum because plaintiffs' malpractice claim was not "based in contract."

When an action is not based on a contract, "the rate of prejudgment interest should be that fixed by article XV, section 1 of the California Constitution; namely, 7 percent per annum."  (*Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 775.)  However, in an action on a contract, when the contract does not stipulate a legal rate of interest, "the obligation shall bear interest at a rate of 10 percent per annum after a breach."  (Civ. Code, § 3289.)

Our Supreme Court has found that "legal malpractice constitutes both a tort and a breach of contract."  (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 180–181.)  And here, the plaintiffs' malpractice complaint contains causes of action for breach of contract, as defendants concede.  However, according to the statement of decision, "[d]uring trial of this matter, Plaintiffs confirmed that they are only pursuing their claims for Professional Negligence and are dismissing their other causes of action."

31

Thus, we agree with defendants that prejudgment interest on the malpractice judgment must be calculated at a rate of 7 percent per annum rather than the 10 percent per annum interest rate applicable to contract claims.[2]

Defendants also point out other aspects of the damages calculation that are either erroneous or indecipherable. For example, the calculation uses a 2015 renewed judgment that was obtained against PW1 to increase the principal amount of the malpractice judgment, which is an error since postjudgment interest on the 2005 judgment stopped accruing in 2008. Furthermore, the two partial recoveries of the 2005 judgment that plaintiffs received are deducted from a running total of malpractice damages as if they were paid in 2015, instead of accounting for those recoveries when they actually happened in 2006 and 2013.

Although these objections by defendants are well taken, defendants do not propose an alternative calculation of damages that includes an award of prejudgment interest on the hypothetical 2008 judgment. For their part, plaintiffs ignore problems with the damages calculation, shedding no light on how interest components of the award might be justified or explained. As the trier of fact in this case, the trial court must recalculate plaintiffs' damages, distinguishing between postjudgment interest on the 2005 judgment, and prejudgment and postjudgment interest on the malpractice judgment, accounting for credits when they occurred, and clarifying other ambiguities in

---

[2] Plaintiffs object that this reduction in rates means defendants' malpractice has unjustifiably cost them three percentage points in the interest they were otherwise guaranteed on the original judgment. But the original judgment was collectable only from unscrupulous businessmen intent on hiding assets, while the malpractice judgment is against a different set of defendants.

the calculation previously adopted.  (See *Thompson v. Asimos* (2016) 6 Cal.App.5th 970.)

## DISPOSITION

The judgment of liability is affirmed but the damages award is vacated and this matter is remanded to the trial court for a recalculation of plaintiffs' damages that is consistent with this opinion.  The parties are to bear their own costs on appeal.


TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
RODRIGUEZ, J.


*Samuels et al. v. Hamrick & Evans, LLP et al.* (A158688, A158878)